In re Jaime and Mary **TARONJI**, Debtors.

**Bankruptcy No. 93 B 6539.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 31, 1994.

Andrew Maxwell, trustee, Chicago, IL.

Howard Adelman, Chicago, IL, for debtors.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This Chapter 7 case is before the court on the trustee's motion for a turnover of proper-

ty from one of the debtors. The property in question is corporate stock. It was awarded to the debtor under an employer's incentive plan before the filing of this bankruptcy case, but the debtor was entitled to unrestricted ownership of the stock only because he maintained his employment during a period that ended about a year after the bankruptcy filing. Whether or not this stock belongs to the estate depends on the application of Section 541(c) of the Bankruptcy Code, which deals with spendthrift trusts, and Section 541(a)(6), which excludes from property of the estate "[p]roceeds ... of ... property of the estate ... such as are earnings from services performed by an individual debtor after the commencement of the case." Because the incentive plan did not create a spendthrift trust, and because the exclusion of Section 541(a)(6) applies to only a portion of the stock received by the debtor, the trustee's turnover motion is granted in part.

### Jurisdiction

 The trustee's motion is a contested matter arising in the bankruptcy case. Ordinarily, a trustee must bring a separate adversary proceeding in order to recover disputed property of the estate, but when the property is held by the debtor, the trustee may proceed by motion. Fed.R.Bankr.P. 7001(1), Advisory Committee Note (1987). The matter is within the jurisdiction of the district court pursuant to 28 U.S.C. § 1334(b) and (d), and may be referred to a bankruptcy judge pursuant to 28 U.S.C. § 157(a). The matter has been so referred pursuant to General Rule 2.33 of the United States District Court for the Northern District of Illinois. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), and hence a bankruptcy judge may enter a final order pursuant to 28 U.S.C. § 157(b)(1).[1]

### Findings of Fact

The facts relevant to this motion are uncomplicated and undisputed. One of the debtors, Jaime Taronji, was hired by an affil-

iate of Tenneco, Inc. in March, 1990. At this time, Tenneco had in effect a "key employee" incentive plan (the Tenneco Inc. Key Employee Restricted Stock and Restricted Unit Plan, the "Tenneco Plan"), which was intended to encourage certain employees to "continue employment with Tenneco Companies, and to render superior performance during such employment." (Tenneco Plan, ¶ 1.) The Plan was to be enforced according to Texas law. (Tenneco Plan, ¶ 14.)

On March 13, 1990, Taronji was given an award of 525 shares of Tenneco common stock pursuant to the Plan. Under the Plan's terms, this award gave Taronji the right to have a stock certificate representing this number of shares registered in his name (but held by Tenneco), and generally gave him all "the rights and privileges of a shareholder ... including the right to receive dividends and the right to vote" these shares. (Tenneco Plan, ¶ 6(b).) However, the awarded shares were restricted; they could not be sold, transferred, assigned, pledged or otherwise encumbered, until the expiration or termination of a "restricted period." *Id.* Taronji's restricted period was set at four years. In addition to the restrictions on transfer of the stock, the plan provided that Taronji would forfeit the awarded shares unless he "continuously remained an employee of Tenneco Companies" during the restricted period. *Id.*

Taronji had the option of either paying taxes on his shares at the time of the award, or of having Tenneco be considered the owner of the shares, for tax purposes, during the restricted period, and of having the taxes paid from the value of the awarded shares at the end of the restricted period. (Tenneco Plan, ¶ 6(b), (c).) Taronji chose the latter option, and so, as of March 13, 1994, the end of the restricted period, he was entitled to receive a stock certificate for the 525 shares, less a number of shares whose value was then equal to the applicable withholding tax-

---

1. The action is one that would have been within the summary jurisdiction of a bankruptcy court under the Bankruptcy Act of 1898, since it seeks to determine the ownership of property in the actual possession of the debtors. *Katchen v. Landy,* 382 U.S. 323, 326–27, 86 S.Ct. 467, 470–71,

15 L.Ed.2d 391 (1966); *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 481, 60 S.Ct. 628, 629–30, 84 L.Ed. 876 (1940); *Whitney v. Wenman,* 198 U.S. 539, 552, 25 S.Ct. 778, 781, 49 L.Ed. 1157 (1905).

es. (Tenneco Plan, ¶ 6(d).) Pursuant to these terms, Tenneco issued to Taronji an unrestricted certificate for 327 shares of stock on March 29, 1994.

About a year earlier, on March 25, 1993, Taronji and his wife filed a voluntary bankruptcy case under Chapter 13 of the Bankruptcy Code. They later converted their case to one under Chapter 7, and Andrew Maxwell was appointed trustee. He filed the pending motion for turnover of the Tenneco stock awarded to Taronji, and the parties have briefed the matter, setting forth the facts outlined above.

### Conclusions of Law

The general framework for deciding whether an asset is property of a debtor's estate in bankruptcy is established by Section 541 of the Bankruptcy Code (11 U.S.C.). Three of the provisions of Section 541 are applicable to the present case.

● First, Section 541(a)(1) sets out the general rule: the commencement of a bankruptcy case creates an estate that can be liquidated to satisfy the claims of creditors. This estate is defined as including "all legal or equitable interests of the debtor in property as of the commencement of the case." Numerous decisions have recognized that this definition is very broad, extending, for example, both to unliquidated claims of the debtor for services rendered, *In re Moulton,* 113 B.R. 732, 733 (Bankr.M.D.Fla.1990), and to contingent beneficial interests of the debtor in trusts, *In re Neuton,* 922 F.2d 1379, 1382 (9th Cir.1990); *In re Knight,* 164 B.R. 372, 374 (Bankr.S.D.Fla.1994).

● Second, Section 541(c)(2) limits the broad scope of the general rule by providing for the enforcement of spendthrift trust provisions, i.e., "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law."

● Finally, Section 541(a)(6) expands the scope of the general rule to include not only property interests of the debtor as of the commencement of the case, but also "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." However, this addition of postpetition "proceeds" to the property of the estate is subject to an exception for "earnings from services performed by an individual debtor after the commencement of the case."

The debtors in the present case assert that the Tenneco stock falls within both the spendthrift trust exception of Section 541(c)(2) and the postpetition earnings exception of Section 541(a)(6).

■ *Spendthrift trusts under Section 541(c)(2).* The debtors' theory under Section 541(c)(2) is the following: (1) when they filed their case, the Tenneco stock was the res of a trust, of which Tenneco was the trustee, and Taronji the beneficiary; (2) Taronji could not transfer his beneficial interest in the trust; and (3) this restriction on transfer prevented the beneficial interest from becoming property of the estate.

Section 541(c)(2) of the Bankruptcy Code does exclude the debtor's beneficial interest in a trust from property of the estate if applicable nonbankruptcy law would both prevent the debtor from voluntarily transferring the beneficial interest and prevent creditors from enforcing judgments against the interest. This is the teaching of *Magill v. Newman,* 903 F.2d 1150 (7th Cir.1990). In *Magill,* the debtor had been named beneficiary of two inter vivos trusts that provided for payments to be made to him until his 50th birthday, at which time the trust would terminate, and he would receive its corpus. The trusts agreements also contained "spendthrift" provisions that were effective under applicable state law.[2] The debtor filed his bankruptcy case when he was 45 years old, and the trustee argued that because the debtor would receive the trust corpus in five

---

2. Each trust agreement provided that "neither the corpus nor the income of the trust estate shall be liable for the debts of any beneficiary thereof, nor shall the same be subject to seizure by any creditor of any beneficiary under any writ or proceeding at law or in equity, and no beneficiary shall have the right or power to give, sell, assign, transfer, pledge, mortgage, or in any other manner dispose of, encumber, or anticipate his or her interest in the income or corpus of any trust estate...." 903 F.2d at 1151. The parties stipulated that these provisions were enforceable under Missouri law, which was applicable. 903 F.2d at 1152.

years, the court should include the present value of this amount as part of the Debtor's estate. The court rejected this argument, noting that "[t]he point of a spendthrift trust ... is to prevent exactly this sort of anticipation by beneficiaries and their creditors," and that "[t]he Bankruptcy Code is designed to further that goal." 903 F.2d at 1153. Thus, if Tenneco's Plan created a spendthrift trust in favor of Taronji, his beneficial interest in that trust would not pass into the debtors' estate in bankruptcy.

■ However, the Tenneco Plan does not create a spendthrift trust. Under Texas law, which the Plan prescribes, an "express trust" is "a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship and which subjects the person holding title to the property [the trustee] to equitable duties to deal with the property for the benefit of another person [the beneficiary]." Tex.Prop.Code § 111.004(4) (1994).[3] Such a trust may be created by several methods, but where the settlor and the trustee are the same party, the only method of creating a trust is the settlor's "declaration that [it] holds the property as trustee for another person." Tex.Prop.Code § 112.001(1) (1994). Where a putative settlor has not made a "reasonably certain" declaration of this intent, there is no trust. This is the holding of *City of Wichita Falls v. Kemp Public Library Board of Trustees*, 593 S.W.2d 834 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). There, a philanthropist donated money and books to create a public library. In a later dispute with the local government, the library board argued that the philanthropist had made his gift in trust, with the board as trustee. However, the court of appeals rejected this argument, because "[o]ne of the basic formalities required to create an express trust is the stated intention of the testator," and because the donor "did not clearly state his intention in this regard." 593 S.W.2d at 836.

In the present case, the Tenneco Plan is set forth in a nine-page printed document, which bears all the hallmarks of careful legal drafting, including the choice of law clause specifying Texas law. In order for this document to have created a trust, it would have had to contain provisions declaring and defining that trust, consistent with the Texas statutes and case law. However, there are no trust provisions of any sort in the Tenneco Plan, and thus, for failure of an express declaration, the Tenneco Plan does not create a trust. *Cf. Daniels v. Pecan Valley Ranch, Inc.*, 831 S.W.2d 372, 378 (Tex.App.—San Antonio 1992, writ denied), *cert. denied*, —— U.S. ——, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993) (court notes absence of trust language in finding that annuity is not a spendthrift trust).

Equally important, the Tenneco Plan does not employ the mechanism of a trust. As noted above, the aim of the Plan was to give key employees an interest in Tenneco stock which could not be alienated for a given period of time, and which would be forfeited if an employee voluntarily left the employ of Tenneco. In this way, the Plan encouraged the employees both to perform at high levels (thus increasing the value of their stock) and to remain employed with Tenneco (thus avoiding forfeiture of their stock). To effectuate this plan, Tenneco could have conveyed *unrestricted* shares of stock to a trustee for the benefit of the key employees, and then imposed spendthrift and forfeiture provisions on the employees' beneficial interest in the stock. See Tex.Prop.Code § 112.035 (1994) (regarding the effectiveness of spendthrift trusts). Instead, Tenneco transferred, directly to the employees, *restricted* shares of its stock. It is true that Tenneco retained the stock certificate, but this was only to enforce its right to forfeiture: the restricted certificates were in the names of the employees. Thus, the limitations on conveyance did not arise from the provisions of any trust, but from the nature of the stock being con-

---

3. The Texas Property Code also defines the terms usually used in describing the parties to a trust. The "settlor" is the person who creates the trust; the "trustee" is the person holding the property in trust; and the "beneficiary" is the person for

veyed.[4] The interest of Jaime Taronji under the Tenneco Plan was not an equitable interest in a trust. Rather, since the Tenneco Plan provided Taronji with an additional form of compensation for his services, Taronji's interest under the plan was a set of legally enforceable contract rights.

■ *Post-petition earnings under Section 541(a)(6)*. Because Taronji's Tenneco stock was not held in a spendthrift trust, it is necessary to consider the debtors' major argument—that the stock was transferred to Taronji as a result of services he performed after the commencement of this case, and so is excluded from the estate under Section 541(a)(6) of the Bankruptcy Code.

■ A number of decisions have stated that Section 541(a)(6) generally operates to exclude from the estate postpetition earnings of an individual debtor. *See, e.g., In re Hellums*, 772 F.2d 379, 381 (7th Cir.1985) (per curiam) ("Post-petition wages are not property of the estate of a Chapter 7 bankrupt. 11 U.S.C. § 541(a)(6).") However, the actual operation of Section 541(a)(6) is more complex.[5] As noted earlier, the general rule is that an estate in bankruptcy generally consists of the legal and equitable interests that the debtor has "as of the commencement of the case." 11 U.S.C. § 541(a)(1). Although this definition is quite broad, including interests of all types and degrees of contingency, it is limited to interests in existence at the outset of the bankruptcy case. Thus, if a debtor first obtains an interest in any property—including wages—after the case commences, that property will not be part of the estate under Section 541(a)(1), simply because it does not fit within the general definition. *See In re Palmer*, 57 B.R. 332 (Bankr.

W.D.Va.1986) (holding that a bonus received by the debtor postpetition was not property of the estate because the award of the bonus was completely discretionary with management, so that the debtor had no legally enforceable interest in the bonus when the case commenced).

■ Section 541(a)(6) expands this basic definition of property of the estate to include certain property interests that are acquired after the commencement of the case—those that are "[p]roceeds, product, offspring, rents, or profits" resulting from property that is otherwise part of the estate. Thus, for example, when a trustee sells inventory that is property of the estate under Section 541(a)(1), the postpetition sales proceeds become property of the estate under Section 541(a)(6). *In re Calstar, Inc.*, 159 B.R. 247, 252 (Bankr.D.Minn.1993) (postpetition credit card sales receipts are property of the estate). Like the general estate definition of Section 541(a)(1), the scope of the "proceeds, product, offspring, rents, or profits" clause in Section 541(a)(6) is quite broad, not limited to the definition of "proceeds" set forth in the Uniform Commercial Code, but encompassing any conversion in the form of property of the estate, and anything of value generated by property of the estate. S.Rep. No. 989, 95th Cong.2d Sess. 82 (1978); H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977) 1978 U.S.Code Cong. & Admin.News 5787; *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 515 (2d Cir.1985) (insurance payments for repairs on automobile that was part of estate); *In re Calder*, 94 B.R. 200, 201 (Bankr.D.Utah 1988), *aff'd*, 912 F.2d 454 (10th Cir.1990) (attorneys' fees for prepetition services).[6]

---

whose benefit the property is held in trust. Tex. Prop.Code § 111.004(14), (18), and (2) (1994).

**4.** The Uniform Commercial Code, as enacted in Texas, makes provision for notice of restrictions on the transfer of securities, Tex.Bus. & Com. Code § 8.204 (1994), and the law of Delaware, under which Tenneco is incorporated, authorizes reasonable restraints on transfer. *Grynberg v. Burke*, 378 A.2d 139 (1977) ("[A] restraint on the free transferability of corporate stock ... is permissible under our law provided it bears some reasonably necessary relation to the best interests of the corporation."); Del.Code Ann. tit. 8,

§ 202(e) (authorizing any "lawful restriction on transfer ... of securities").

**5.** *See In re Cooley*, 87 B.R. 432, 436–40 (Bankr. S.D.Tex.1988), for a thorough discussion of the history and operation of Section 541(a) generally and of Section 541(a)(6) in particular.

**6.** Section 552(b) of the Bankruptcy Code provides that postpetition "proceeds, product, offspring, rents, or profits" of the debtor's property may be subject to a security interest if the security agreement and applicable nonbankruptcy law so provide. Because of the reference to state

■ Without limiting language, the broad "proceeds" clause of Section 541(a)(6) could have resulted in the estate absorbing certain earnings from services performed by an individual debtor after the bankruptcy was filed. For example, an individual debtor who provided personal services under an employment contract would have, at the time of the bankruptcy, a contract right to be paid for the future services. Although the debtor would have to perform the services in order to realize the right to payment, the contingent nature of the contract right would not prevent it from entering the estate, and if the debtor satisfied the contingency by performing the services, the resulting earnings would be "proceeds" of the contract right that existed at the time of filing.[7] This result—the postpetition earnings of the debtor being used to fund an estate payable to prepetition creditors—contradicts the longstanding "fresh start" policy of federal bankruptcy law. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (prohibiting postpetition enforcement of wage assignments under the fresh start policy, and stating that, under this policy, an individual debtor, upon surrendering his or her property to the estate, should be given "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."). Consistent with the fresh start policy, the "postpetition earnings" exception of Section 541(a)(6) excludes from the estate "proceeds"

of estate assets insofar as they arise from postpetition services of an individual debtor.[8]

The application of the postpetition earnings exception requires a proportional division whenever "proceeds" arise both from postpetition services of an individual debtor and from other estate assets. One pre-Code case presents a particularly clear example of the circumstances that lead to such a division. In *In re Sporleder,* 456 F.2d 1081 (9th Cir.1972), the debtor sold his business, and, as part of the sales agreement, undertook to work for the new owners. The sale contract called for certain payments to be made to the debtor, without declaring the basis on which the payments were made. The debtor filed a bankruptcy petition during the time of the contractual payments, and, the Ninth Circuit held, it was proper for the bankruptcy court to take evidence to determine what part of the payments related to the sale of the business (and so should be included in the estate) and what part related to the debtor's postpetition services (and so should be excluded). More recently, in *In re FitzSimmons,* 725 F.2d 1208 (9th Cir.1984), an attorney who practiced in a sole proprietorship filed a bankruptcy case, and afterwards continued to operate his practice. There, the court had to make a division between the receipts of the practice that resulted from the postpetition personal services of the debtor, and the receipts that were proceeds of other assets of the estate:

---

law, several courts have held that only "proceeds, product, offspring, rents, or profits" recognized by state law are within the scope of Section 552(b). *In re Bumper Sales, Inc.,* 907 F.2d 1430, 1437 (4th Cir.1990); *Financial Security Assurance, Inc. v. Tollman–Hundley Dalton, L.P.,* 165 B.R. 698, 704 (N.D.Ga.1994). In contrast, Section 541(a)(6) is in no way limited by reference to state law, and a broad interpretation, consistent with the legislative history, is appropriate. *See Financial Security Assurance,* 165 B.R. at 703 (distinguishing Section 541(a)(6) from Section 552(b)).

7. Even under the relatively limited view of "proceeds" taken by the Uniform Commercial Code, this would be the situation. An unperformed contract for services falls within the U.C.C. definition of an "account": "any right to payment ... for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." U.C.C.

§ 9–106 (1992). Such "accounts" may be collateral subject to a security interest, U.C.C. §§ 9–102(a), 9–203, and "proceeds" includes "whatever is received upon the ... collection ... of collateral," U.C.C. § 9–306(1) (1992).

8. The Code's treatment of postpetition earnings can be traced to the legislation proposed by the Commission on the Bankruptcy Laws of the United States in 1973. In the notes accompanying Section 4–601 of this legislation, which defined property of the estate in a manner similar to Section 541(a)(1) of the Code, the Commission explained that "property of the estate does not embrace the right of the debtor to compensation for personal services to be rendered after the date of the petition pursuant to a contract then in existence" and quoted the holding of *Local Loan.* Report of the Commission on the Bankruptcy Laws of the United States (H.R.Doc. No. 93–137, 93d. Cong., 1st Sess., Pt. II 149 (1973), reprinted in Collier on Bankruptcy, 15th Ed., App. 2.

[W]e hold that § 541(a)(6) excepts from the proceeds of the estate only those earnings generated by services personally performed by the individual debtor. [Debtor] is thus entitled to monies generated by his law practice only to the extent that they are attributable to personal services that he himself performs. To the extent that the law practice's earnings are attributable not to [debtor's] personal services but to the business' invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships, fee agreements, or the like, the earnings of the law practice accrue to the estate.

725 F.2d at 1211.

In the same way, it is sometimes necessary to divide postpetition receipts into those that represent payment for prepetition services of an individual debtor and those that represent payment for postpetition services. This was the situation in *In re Ryerson*, 739 F.2d 1423 (9th Cir.1984), where the debtor was the district manager for an insurance company, and worked under an employment agreement that entitled him to a termination payment based on the number of years he held the position. The debtor filed a Chapter 7 case on February 10, 1981, and was terminated as District Manager on November 1, 1981. The value of his termination payment was $18,588. In determining the extent to which this payment was property of the estate, the court held that (1) pursuant to Section 541(a)(1), the contract right to the termination payment was property of the estate at the time the case commenced, even though it was contingent and not immediately payable, 739 F.2d at 1425; (2) pursuant to Section 541(a)(6), the contract termination payment, as a proceed of the contract right was part of the estate even though paid after commencement of the case, "at least to the extent the payments are related to prebankruptcy services," *id.;* and (3) pursuant to the postpetition earnings provision of Section 541(a)(6), "any portion of the $18,588 related to services performed after February 10, 1981 are not includable with the bankruptcy estate," 739 F.2d at 1426.

The approach of *Sporleder, FitzSimmons,* and *Ryerson* provides the proper rule for decision in the present case. When this case was filed, Jaime Taronji had a contract right to receive unrestricted Tenneco stock, contingent on his working for Tenneco companies until March 13, 1994. The contingency did not prevent this contract right from becoming property of the estate under Section 541(a)(1). Moreover, the stock itself was the proceeds of that contract right, and thus was includable in the estate under Section 541(a)(6). However, because the contingency required Taronji's postpetition services in order to be satisfied, that portion of the stock related to Taronji's postpetition services must be excluded from the estate under the postpetition earnings exception of Section 541(a)(6).[9]

Both the trustee and the debtors resist this conclusion. The trustee argues that Taronji already owned the stock itself prior to the filing of the bankruptcy case, and that his ownership was merely subject to forfeiture in the event that he did not remain employed with Tenneco. That "condition subsequent," the trustee contends, should not prevent the stock from becoming property of the estate. The difficulty with this argument is that the stock Taronji owned prepetition was restricted stock. The only rights it conferred on Taronji were to receive dividends and vote the stock, and even these rights were only accorded while Taronji was employed by Tenneco. The estate would not have been benefitted by assuming Taronji's rights in this restricted stock: the dividends, to the extent that they were earned postpetition, depended on Taronji's postpetition services, and hence would be excluded from the estate under the postpetition earnings exception. The right to vote the stock would confer no benefit whatever on the estate. What was of value to the estate was unrestricted ownership of the stock, and this was contingent on Taronji's postpetition services.

The debtors argue that the entire value of the stock depended on Taronji's postpetition

---

**9.** The portion of the stock included in the estate is 75.91%. Taronji had to work for four years (1461 days) in order to be entitled to the stock.

Of this period he worked 1109 days before filing the bankruptcy case. 1109/1461 = .7591.

services, since, unless he was employed post-petition, the stock would not have been awarded. However, while Taronji's postpetition employment was necessary to the award of Tenneco stock, it was hardly sufficient. Taronji was entitled to this stock under the Tenneco Plan because he had been continuously employed for four years. His prepetition services were also essential. Indeed, the Tenneco Plan was in effect a supplemental compensation arrangement. If Taronji worked for Tenneco companies for four years continuously, he was entitled to the supplemental compensation. The services rendered for the entire period were the basis for the compensation, just as with the district manager in *Ryerson.*

### Conclusion

For the reasons stated above, the turnover motion of the trustee is granted in part. A separate order will be entered requiring the debtor to turn over to the trustee 75.91% of the Tenneco stock received by the debtor on March 29, 1994.