**In re Fletcher ALLEN, Debtor.**

**Fletcher ALLEN, Plaintiff and Counter–Defendant,**

**v.**

**Phillip LEVEY, not individually but solely in his capacity as Trustee, Defendant and Counter–Plaintiff.**

**Bankruptcy No. 97 B 00858.
Adversary No. 98 A 00699.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 10, 1998.

Drew M. Dillworth, Jamie L. Zukosky, Raleigh Helms & Finke, Chicago, IL, for Plaintiff.

Max Chill, Steven R. Radtke, Chill, Chill & Radtke, Chicago, IL, for Defendant.

## MEMORANDUM OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case relates to a bankruptcy proceeding filed by Fletcher E. Allen ("Debtor" or "Allen") under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Allen has filed a Complaint against the Trustee, requesting the Court to adjudge and declare that none of several stock options granted to Allen by his employer, Amoco Corporation ("Amoco") are property of the bankruptcy estate. The Complaint pleads two counts. Count I concerns options that were exercisable prior to the date Debtor filed his bankruptcy petition. Count II concerns options that were not exercisable as of the filing date but have since become exercisable.

The Trustee filed a two-count counterclaim. Count I of the Counterclaim seeks Declaratory Judgment finding that all of the stock options are property of the estate. Count II requests that the Court order the Debtor to turn over all of the options to the Trustee.

This matter comes before the Court on Allen's motion for summary judgment on Counts I and II of his Complaint and on the Trustee's cross-motion for summary judgment on Counts I and II of his counterclaim. For reasons set forth below, the Trustee's Motion for Summary Judgment will be en-tirely allowed, while Plaintiff's Motion for Summary Judgment will be entirely denied.

Jurisdiction lies under 28 U.S.C. § 1334, and core jurisdiction exists under 28 U.S.C. § 157(b)(2)(E). This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409.

### Uncontested Facts

The parties submitted a Joint Stipulation of Uncontested Facts. This statement of uncontested facts has been compiled from both the Stipulation and the Debtor's schedules for description of his creditors in bankruptcy.

On March 28, 1995, Amoco Corporation ("Amoco") and the Debtor, then employed as its Business Development Manager, entered into a Stock Option Agreement ("1995 Agreement") wherein Amoco granted Allen the right to purchase all or any part of an aggregate of 1,400 shares of the company's common stock at a price of $62.6875 per share. Amoco made this grant under provisions of the 1991 Incentive Program of Amoco Corporation and Its Participating Subsidiaries. Allen received this grant in addition to his 1995 salary of $125,000.

Under the 1995 Agreement, one-half the total number of options granted (i.e., 700 options) became exercisable in whole or in part on March 28, 1996 (one year from the date of the 1995 Agreement), as long as Allen remained continuously in the employ of Amoco or of a participating subsidiary. (This group of options will be referred to as the "First Group.") The second half became exercisable on March 28, 1997 (two years from date of the 1995 Agreement) and under the same conditions. (This group of options will be referred to as the "Second Group.") Options in the First and Second Groups will remain exercisable until March 28, 2005, or until Allen's employment terminates for reasons other than death, retirement, or total disability. If Allen's employment with Amoco terminates for any other reason before he exercises his option rights, the unexercised option rights will also terminate.

On March 26, 1996, Amoco and the Debtor entered into a second Stock Option Agreement ("1996 Agreement") wherein Amoco granted Allen the right to purchase all or any part of an additional aggregate 1400 shares of the company's common stock at a price of $73.2500 per share. Allen received this grant in addition to his 1996 salary of $133,200.

The 1996 Agreement was subject to the same terms as the 1995 Agreement, except that the first 700 options under the 1996 Agreement ("Third Group") became exercisable on March 26, 1997 and the second 700 options ("Fourth Group") became exercisable on March 26, 1998. These options will remain exercisable until March 26, 2006 or until Allen's employment terminates for reasons other than death, retirement, or total disability.

Allen remains employed by Amoco, has not retired, and is not disabled.

On January 10, 1997, Allen filed his Petition for relief under Chapter 7 of the Bankruptcy Code. The List of Creditors and claims scheduled in that Petition listed the following:

| Creditor | Claim & Security | Claim Amount |
| --- | --- | --- |
| Citicorp Mortgage | Mortgage secured by Debtor's home | $243,500.00 |
| Dr. Sharon Durfee | Medical bills | $320.00 |
| General Electric Capital Corp. | Guaranty | $2,140,864.00 |
| Heidelburg Eastern, Inc. | Guaranty of Viking Ent. Prtg. Pres | Unknown |
| MNC Credit Corporation | Guaranty | $281,000.00 |
| Warren Hansen | Contribution on Guaranty | Unknown |

Prior to the bankruptcy Petition filing date, the First Group of options was exercisable. The value of the stock options at any point in time is the amount of profit to be realized by effecting purchase at the price granted in the Agreements after the options are exercisable and their sale at market price. The value of the First Group on the Petition date can be computed by subtracting the option price per share ($62.6875) from the January 10, 1997 closing price of Amoco Corporation common stock ($85.00), then multiplying the difference by the number of options in the First Group (700). Thus, on January 10, 1997, value of the First Group was $15,487.50 ( [$85 less $62.875] × 700). Allen could have realized this profit on or before January 10, 1997 simply by exercising his rights to the First Group of options.

The Second Group became exercisable on March 28, 1997, 77 days after the bankruptcy filing. The Third Group became exercisable on March 26, 1997, 75 days after filing. The Fourth Group became exercisable on March 26, 1998, 440 days after filing.

On April 29, 1998, Amoco common stock split 2–1. Giving effect to the stock split so as not to dilute Debtor's rights now that all relevant time requirements have expired, Debtor is entitled to exercise the following options to purchase 5,600 shares of Amoco stock:

1) 2,800 shares at a purchase price of $31.3438 per share under the 1995 Agreement; and

2) 2,800 shares at a purchase price of $36.625 per share under the 1996 Agreement.

To date, Allen has not exercised any of the options, though he is still in Amoco's employ and all his options are now exercisable.

The current value of options in the First and Second Groups can be computed by subtracting the option price ($31.3438) from the November 3, 1998, market price ($58.00), then multiplying the difference by the number of options (2,800). Thus, the combined value of the First and Second Groups on November 3, 1998, was $74,637.36 ( [$58.00 less $31.3438] × 2,800). The value of the Third and Fourth Groups on November 3, 1998, can be computed by subtracting the option price ($36.625) from the market price ($58.00), then multiplying by the number of shares (2,800). Thus, the value of the Third and Fourth Groups on November 3, 1998, was $59,850 ( [$56.75 less $36.625] × 2,800).

The total value of options in all four groups was $134,487.36 on November 3, 1998 ($74,-637.36 + $59,850) less any broker fees or commissions that might be due. This figure represents the profitable spread between the option prices and the market price, and not the value of the Amoco shares themselves, which would be $324,800 (5,600 × $58.00).

### Arguments of the Parties

Allen makes two arguments. First, he argues that the First Group of options, exercisable when he filed his petition, is not property of the estate simply because he has never before or since exercised any of the options and would thus forfeit them should he leave Amoco's employ. He reasons that, because his continued employment with Amoco is a condition precedent to exercising of the options, they therefore represent a form of his potential post-bankruptcy earnings. He invokes 11 U.S.C. § 541(a)(6), which excludes from property of a Chapter 7 estate earnings from services performed by an individual debtor after filing of the case.

Allen next argues that the Second, Third, and Fourth of the option groups, were unexercisable when the bankruptcy was filed, were not his property at all at that time, and are therefore not now property of the estate. He points out that exercise of those options was at that time contingent upon his continued employment. He reasons that the Second, Third, and Fourth option groups therefore represent remuneration for continued, post-petition services rendered and should be classified as post-petition earnings, again invoking 11 U.S.C. § 541(a)(6) in support of this second argument.

Allen makes one additional argument in his Memorandum filed in support of his Motion for Summary Judgment (not in the Motion itself or in the Complaint). He argues that, even if the First Group is property of the estate, any increase in value from the date of filing to the present is a result of post-petition services and should be excluded from property of the estate under 11 U.S.C. § 541(a)(6).

In support of his Counterclaim, the Chapter 7 Trustee makes the point under 11 U.S.C. § 541(a)(1) that property of the Chapter 7 estate is comprised of all legal and equitable interests of the debtor in property as of the commencement of the case. The Trustee argues that Allen had acquired and entered into both the 1995 and 1996 Agreements as of the petition date, and that the Agreements themselves create his property interests. He reasons that Debtor's interest in the options were thus created prior to the bankruptcy petition filing date, and those interests were in existence when Allen filed the bankruptcy petition, albeit contingent on passage of time and future exercise of his rights.

### APPLICABLE STANDARDS FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56, made applicable to adversary proceedings under Fed.R.Bankr.P. 7056 that summary judgment should be granted if the entire record, including pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; Celotex v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has a burden to show that no genuine issue of material fact is in dispute. Celotex, 477 U.S. at 322, 106 S.Ct. 2548. All inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a rational trier of fact could not find for the non-moving party based on the record taken as a whole, then there is no genuine issue for trial and summary judgment will be granted. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### ANALYSIS

The very act of filing a Chapter 7 petition for relief in bankruptcy creates a bankruptcy estate containing certain of the debtor's nonexempt assets which the trustee will distrib-

ute to the debtor's creditors according to provisions of the Bankruptcy Code. Section 541 of the Code defines which parts of a debtor's property become property of the bankruptcy estate. 11 U.S.C. § 541. Sections 541(a)(1) and (a)(2) define the initial pool of property interests that forms the estate. *In re Cooley,* 87 B.R. 432, 436 (Bankr.S.D.Texas 1988). Section 541(a)(1) provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate. 11 U.S.C. § 541(a)(1). Section 541(a)(2) includes spousal community property in the estate, and §§ 541(a)(3) through (a)(7) expand the property pool to include certain property acquired post-petition as property of the estate. Sections 541(b), (c), and (d) provide limitations on the property pool created by §§ 541(a)(1) and (a)(2).

Section 541(a)(6) is both an "inclusion" section, expanding the pool of estate property, and an "exclusion" section, imposing limits on what property the estate may take in. It expressly includes "[p]roceeds, product, offspring, rents, and or profits of or from property of the estate," but expressly excludes "earnings from services performed by an individual debtor after the commencement of the case." *Id.* Section 541(a)(7) is a catchall that sweeps into the estate "[a]ny interest in property that the estate acquires after the commencement of the case."

The pending cross-motions for summary judgment present two issues: The first is whether the stock options are "property" or "interests in property." If none of the options were "property" or "interests in property," then none of the options could be property of the estate under § 541, and thus our inquiry would be ended. If the options are property or interests in property, then they are property of the estate and the second issue is whether their entire present value or some reduced value should be included in the estate.

## I. The contractual right to purchase shares of stock at a given price is an interest in property that became property of the estate at the commencement of the case.

■ A stock option is a contract for transfer of shares of stock, subject to the same rules of construction as any other contract. *Joseph v. Wilson,* 57 Ill.App.3d 212, 216, 372 N.E.2d 1110, 1112–13, 14 Ill.Dec. 831, 833–34 (Ill.App.1978). Consideration for any employer to give an option to an employee is ordinarily the employee's past services which have contributed to the employer's success. 18B Am.Jur. 2d *Corporations* § 1957 (1985). Issuance of a stock option contract imposes a binding obligation on the corporation to deliver the shares upon exercise by the optionee. 18B Am.Jur. 2d *Corporations* § 1960 (1985).

The 1995 and 1996 Agreements are stock option contracts that grant to Allen the right to purchase shares of Amoco stock if Allen meets certain conditions precedent to exercise. If Allen meets those conditions, then Amoco is under a binding obligation to sell him the stock at the option price.

The Code does not provide a definition for either the term "property" or the term "interest in property." However, many courts have considered the meanings of those terms and have held that they should be construed extremely broadly, encompassing virtually every right that a debtor has at the time of filing. *See, e.g., Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966) (commenting that "the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed"), *In the Matter of Yonikus,* 996 F.2d 866 (7th Cir.1993) (explaining that "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541"). Congress intended to bring "anything of value" that the debtor owns into the estate. H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977); *see also* S. Rep. No. 989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. and Admin.News, 5787, 6136–37, 5868–69.

■ To ensure that "anything of value" becomes part of a debtor's estate, Congress enacted § 541(a)(7), which provides that any interest in property that the estate collects

or perfects post-petition is also property of the estate. 11 U.S.C. § 541(a)(7). Congress enacted § 541(a)(7) to clarify its intention that § 541 be an "all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate." 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978); S17413 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen DeConcini.

Courts faced with the problem of defining precisely what is "property" or an "interest in property" have considered many interests whose nature was intangible or elusive. *See* George R. Pitts, *Rights to Future Payment as Property of the Estate Under Section 541 of the Bankruptcy Code*, 64 AM. BANKR.L.J. 61 (1990) (comparing decisions discussing the "temporal" dimensions of various types of interests in property to decisions using a "conceptual" approach designed to balance creditors' need to be paid with debtors' need for a fresh start).

Different interests have been held in many cases to be estate property although intangible or elusive because, while the debtors there owned a present right, the present right at the time of bankruptcy filing was the right to receive future, post-petition, contingent enjoyment, possession, receipt, realization or the like.

In *Segal, supra*, the Supreme Court held that loss-carry back tax refunds were property of the estate where the debtor incurred the losses prior to filing but where the government paid the refund post-petition. The debtor then argued that it could not legally have made its claim to the refund until a post-petition date. The Court's opinion rejected that contention:

> [P]ostponed enjoyment does not disqualify an interest as 'property.' That earnings by the bankrupt after filing the petition might diminish or eliminate the loss-carry back refund claim does further qualify the interest, but we have already noted that contingency in the abstract is no bar and the actual risk that the refund claims may be erased is quite far from a certainty.

*Id.* The *Segal* opinion classified the refund as "property," finding that the refund was "sufficiently rooted in the pre-bankruptcy past." *Segal,* 86 S.Ct. at 515.

A panel of the Seventh Circuit Court of Appeals found a "potential personal injury claim," to be property of the estate. *In the Matter of Yonikus,* 974 F.2d 901, 905 (7th Cir.'1992). It has also found a potential workers' compensation claim, which the Court described as "a contingent right to future compensation" to be property of the estate. *Yonikus,* 996 F.2d at 869.

Even the right to bring a "bad-faith" claim accruing post-petition against an insurance company (that denied the debtor insurance coverage, refused to defend the debtor in a personal injury lawsuit, and refused to settle the claims against him) was held to be an interest in property that was part of the bankruptcy estate. *Field v. Transcontinental Ins. Co.,* 219 B.R. 115, 119 (E.D.Va.1998). The debtor in *Field* did not request indemnification from the insurance company until eight months after the bankruptcy filing. Thus, the insurance company's actions giving rise to the bad faith claim did not take place until eight months post-petition. The opinion nevertheless found that the bad-faith action was property of the estate on two alternate grounds: First, the accident for which the debtor claimed coverage occurred four months pre-petition and his contingent right to coverage arose at that time. The contingent right to coverage was sufficiently rooted in the pre-bankruptcy past to be part of the bankruptcy estate. *Id.* Second, the insurance policy and the rights it created existed pre-petition. If the debtor had rights under the policy, those rights came into existence pre-petition. Any pre-petition rights that the debtor had pursuant to the policy were interests in property that became property of the estate when he filed his petition. *Id.* at 120.

A debtor's contingent interest in the *corpus* of a trust, subject to divestment until the debtor reached the age of 25, was held to be a bankruptcy estate interest in property although the debtor's twenty-fifth birthday was 15 months away when he filed in bankruptcy. *In re Dias,* 37 B.R. 584, 587 (Bankr.D.Idaho 1984). *Accord see In re Neuton,* 922 F.2d 1379, 1382–83 (holding that debtor's right to

receive a share of income from a trust upon his mother's death and a share of the *corpus* when the trust terminated was a beneficial interest that became property of the bankruptcy estate to the extent it was unprotected by a spendthrift clause); and *In re Smith,* 189 B.R. 8, 10–11 (N.D.Ill.1995) (deciding that the debtor's unvested, contingent interest in a revocable trust was an equitable interest in property). Post-petition payments owing to debtor under terms of a pre-petition non-competition agreement were sufficiently rooted in the pre-bankruptcy past to constitute property of the estate, even though the debtor was under a continuing obligation to forbear from competition in order to receive them. *In re Andrews,* 153 B.R. 159, 164 (Bankr.E.D.Va.1993).

Where a debtor-employee's employment terminated seven months post-petition, and where that termination entitled him to post-petition payments from the employer, such payments were property of the estate "to the extent the payments are related to pre-bankruptcy services." *In re Ryerson,* 739 F.2d 1423, 1425 (9th Cir.1984), *see also, In re Wu,* 173 B.R. 411, 416 (9th Cir. BAP 1994) ("Whether and to what extent [insurance policy] renewal commissions are excluded from the estate depends upon whether the debtor's postpetition services are a prerequisite to the right to the renewal commissions and, if so, the extent to which the commissions are attributable to prepetition services"). A realtor's commission, payable three weeks post-petition but resulting from a sale originating five years earlier, was property of the estate. *In re Tully,* 202 B.R. 481, 484–85 (9th Cir. BAP 1996). The right to receive post-petition payments for prepetition services performed under attorneys' contingent fee contracts becomes property of the estate. *Carlson v. Brandt,* 1997 WL 534500 at * 2 (N.D.Ill.1997); *Turner v. Avery,* 947 F.2d 772, 774 (5th Cir.1991); *In re Jess,* 215 B.R. 618, 622 (9th Cir. BAP 1997); *In re Bagen,* 201 B.R. 642, 643–44 (S.D.N.Y.1996); *In re Paul Nelson, P.A.,* 203 B.R. 756, 761 (Bankr. M.D.Fla.1996).

Several opinions discussed below have also considered whether stock options are bankruptcy estate property or interests in property. While those decisions did not deal with precisely the same circumstances present here, the facts and reasoning of their rulings strongly support a finding here that Debtor held a property interest in all of his option rights when he filed in bankruptcy, even though none had been exercised and many were not exercisable until later.

In *In re Larson,* the debtor received options to 10,000 shares in lieu of compensation for his services on the company's board of directors during the fiscal year ending June 30, 1991. 147 B.R. 39, 40 (Bankr.D.N.D. 1992). He received the grant on July 16, 1990 and the options were exercisable upon issue, subject only to a five-year expiration date. He filed for relief in bankruptcy on October 16, 1990. The trustee assumed the stock options as an executory contract under § 365 of the Code, and the debtor filed an adversary complaint arguing that the options were post-petition wages for his services as a director. The Court held, given language of the grant, that the options were "earnings" under § 541(a)(6), *Id.* at 42, but that not all of the earnings were postpetition earnings. *Id.* at 44. The debtor had served as a director for 117 days pre-petition and, thus, a *pro rata* share equal to 117 days became property of the estate. *In re Larson,* 147 B.R. at 44; *See also In re Tobiason,* 185 B.R. 59, 63 (Bankr.D.Neb.1995), (concluding that a ten-year stock option exercisable on issue was property of the estate).

In *In re Taronji,* the debtor received an award of 525 shares of stock under a "key employee incentive plan" intended to encourage employees to continue employment with the company. 174 B.R. 964, 966 (Bankr. N.D.Ill.1994). Although he received shares, and not an option to purchase shares, the shares were restricted for a four-year period expiring March 29, 1994. On March 25, 1993, debtor filed for relief in bankruptcy. The debtor argued that the shares were post-petition earnings because he had to remain employed for one year post-petition to receive the shares unrestricted. The opinion found that when the bankruptcy was filed the debtor possessed a contract right to receive unrestricted shares, contingent upon his continued employment until March 13, 1994. *Id.*

at 971. The opinion held that the contingent contract right became property of the estate under § 541(a)(1) and that the unrestricted stock was proceeds of the contract right under § 541(a)(6). *Id.* The Court then excluded the *pro rata* portion of the stock related to the debtor's post-petition services as post-petition earnings under § 541(a)(6). *Id.*

Two bankruptcy opinions have found that stock options are "equity securities" in contexts other than property of the estate. *In re America West Airlines,* 179 B.R. 893, 897 (Bankr.D.Ariz.1995); *In the Matter of Baldwin–United Corp.,* 52 B.R. 549, 552 (Bankr. S.D.Ohio 1985). The Bankruptcy Code defines "equity security" as a "share in a corporation" and includes the right to purchase shares within the definition. 11 U.S.C. § 101(16). The Code defines the term "security" as encompassing stocks and the right to purchase them. 11 U.S.C. § 101(49)(xv). Stocks and other forms of securities are regarded as interests in property, and thus as property of the estate. *In re Meade,* 84 B.R. 106, 107 (Bankr.S.D.Ohio 1988). Stock options, as rights to purchase securities, are securities under the Code, and become property of the estate.

The Debtor's position in the present case is that all of his stock options are excluded from the estate by § 541(a)(6), because he must remain continuously in Amoco's employ to retain the right to exercise them. He maintains that this requirement makes the stock options post-petition earnings and not a property interest. He asserts that on the bankruptcy petition filing date he "had no rights, legal nor equitable, to possession of the [Second, Third, and Fourth Groups of] options for Allen had not, and could not have, performed the acts required to exercise these options." Pl. Memorandum, p. 5.

If, as Debtor argues, he had quit his job at Amoco, the rights would no longer exist. However, Debtor did not quit his job and the options are all now exercisable. *See Bagen,* 201 B.R. at 644 ("A short answer to this argument is that ... the Debtor was not discharged by the client for cause, and did in fact complete the work, or is engaged in doing so").

Debtor has confused the right to possession of the stock with the rights granted to him under the 1995 and 1996 Agreements. While one right may lead to the other, they are not the same right. He clearly had no right to possession of the stock or to exercise the Second, Third, and Fourth Groups on the bankruptcy filing date. However, the right to possession is not the right at issue here. The right at issue is the right to exercise the options contingent upon Allen's continued employment with Amoco for a specified period of time; Allen possessed this interest and right at commencement of his bankruptcy case.

This right is no different than the contingent right to share in the *corpus* of a trust upon reaching a certain age. The intended beneficiary may not presently have the money, but has the right to take possession of it in the future if he or she lives until the specified birthday.

The right is similar to the right at issue in *Taronji, supra.* The debtor there had no right to possession of the stock when he filed his petition, but he did have the right to take possession if he later met conditions of the grant.

Although Debtor here did not become entitled to exercise all of the stock options until after filing his petition, he did possess at that time the contingent right to exercise the options in the future. This interest was sufficiently rooted in the pre-bankruptcy past to be property of the estate. He entered into the 1995 Agreement almost two years prior to his bankruptcy and into the 1996 Agreement nine months before. When he entered into those Agreements, he became owner of the contingent rights granted therein. Those rights were his rights to exercise options under the time and employment conditions prescribed.

■ Upon his commencement of this bankruptcy case, some of those rights had vested in Debtor subject to divestment if he later left Amoco's employ without exercising the rights, and some of his rights were then contingent on his continued employment. A contingency is no bar to property interest becoming property of the bankruptcy estate, even if the contingency requires additional

post-petition services, and even if the right to enjoyment of the property may be defeated. The Debtor's contract rights under the 1995 and 1996 Agreements, whether then vested or contingent, became property of the estate under § 541(a)(1) on the petition filing date, January 10, 1997.

## II. Although the contingent, contractual rights to purchase stock were and are property of the estate, the rights became more valuable due, in part, to the post-petition services of the Debtor.

Having determined that the Debtor's contract rights as of the commencement of the case are property of the estate, the Court must next determine whether and to what extent those rights were modified or made valuable by Debtor's post-petition employment. In so doing, we must consider the dual purposes of the Code: first, to maximize the creditors' recovery and second, to provide the debtor with a fresh start. *Segal,* 382 U.S. at 379, 86 S.Ct. 511.

Allen's choice of filing date is troubling when considered in light of the timing sequence for exercising the options. Although Debtor had personally guaranteed some very large loans, none of his creditors had judgments outstanding against him. Nothing in the record suggests that any pressure by creditors forced to him to select January 10, 1997 (77 days before three-quarters of the options would be exercisable) as the date on which to file.

■ It is by no means improper or forbidden to time a bankruptcy filing in a debtor's best interests. No competent attorney would advise a client to do otherwise. Nothing in the background of this case indicates any wrongdoing on the Debtor's part.

■ Yet, if the Code's purpose of maximizing the estate for benefit of creditors is to be realized, it must be asked whether any debtor can take special advantage of the economic consequences of the choice of filing date in circumstances presented here. *See Tully,* 202 B.R. at 485 (holding that to allow real estate agents to file bankruptcy petitions shortly before escrow closings and then claim their commissions as post-petition earnings

would circumvent the purpose of the Code). The right of a debtor to choose the time of filing does not include the right to discharge debts without turning over valuable conditional rights.

Debtor relies in part on *Everett v. Judson,* 228 U.S. 474, 479, 33 S.Ct. 568, 569–70, 57 L.Ed. 927 (1913). However, neither § 541(a) nor the Bankruptcy Code itself was in existence when the Court decided *Everett;* that opinion dealt with § 70a of the old Bankruptcy Act.

*Everett* reasoned that "[w]e think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition was filed...." 33 S.Ct. at 569–70. If the Court's comment on § 70(a) of the old Bankruptcy Act were viewed as applicable to § 541 of the Bankruptcy Code, then provisions of §§ 541(a)(3) through 541(a)(7) which include some after-acquired property in the estate, expressly allowing the condition of the bankrupt estate to expand, would make no sense. Rather, the legislative history of § 541 shows that provision was intended to follow the result in *Segal v. Rochelle, supra;* an opinion which included contingent interests as property of the bankruptcy estate. H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977); *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. and Admin.News, 5787, 6136–37, 5868–69.

Enactment of § 541 considerably broadened the definition of estate property. *See Neuton,* 922 F.2d at 1382 (noting that while contingent interests presented a "thorny problem" under the Act, contingent interests have typically been held to property of the estate under the Code); *Accord Ryerson,* 739 F.2d 1423; *In re Bagen,* 186 B.R. 824, 826–28 (Bankr.S.D.N.Y.1995), *aff'd,* 201 B.R. at 642; *Cooley,* 87 B.R. at 438, (comparing the Code to the Act).

Both the Debtor and the Trustee would draw a bright line in time. Debtor argues that the Second, Third, and Fourth Groups had no value to the estate because they were still contingent when he filed his petition, and even the First Group rights had not been

exercised. The Trustee contends that all of the options had and have value to the estate because the estate became the owner of contingent rights when Debtor filed the petition and Debtor has now satisfied the contingencies. Each side advances an "all-or-nothing" proposition that fails to take into consideration the temporal spread involved in exercising the options.

■■■■ However, the actual value to the estate of contingent future interests must be equal to the value of the debtor's interest on the petition filing date. The extent of the bankruptcy estate's interest in property cannot exceed the interest possessed by the debtor at commencement of the case. *In the Matter of Wayco*, 947 F.2d 1330, 1333 (7th Cir.1991). The realized or realizable value of an interest that was contingent at the time of filing is property of the estate only to the extent that the subsequently realized value is related to pre-petition actions of the debtor. The *quantum meruit* theory courts frequently use to determine the pre-petition value of a debtor-attorney's services under a contingent fee contract supports this conclusion. *See, e.g., In re Carlson*, 211 B.R. 275, 279 (Bankr.N.D.Ill.1997) (discussing *quantum meruit* decisions).

■■■■ As discussed in part I of this Opinion, the contingent contract rights were Allen's when he filed the bankruptcy petition, and they then became property of the estate. Allen had met a substantial portion of the conditions precedent pre-petition, but without his continued services post-petition the estate's rights of exercise would not have been realized. To realize the full value of the options, Allen had to provide services to Amoco for a specified number of days. Applying a *quantum meruit* analysis, the realized value of the options is property of the estate only to the extent that the required days had passed pre-petition.

This conclusion is in keeping with the language of § 541(a)(6) and reconciles the provision that profits and proceeds of property of the estate are property of the estate with the provision that earnings due to post-petition services of the debtor are not. It is also consistent with the language of § 541(a)(7), intended to ensure that any estate interest in property acquired post-petition is property of the estate.

Because Debtor's contingent contract rights became property of the bankruptcy estate on January 10, 1997, his subsequent rights to exercise them, which continued and still exist post-petition, may be interests in property acquired post-petition under § 541(a)(7). But they are certainly matured rights that comprise proceeds and profits from the original property of the estate under § 541(a)(6). However, because the now-exercisable rights are a product of both pre-petition and post-petition efforts by the Debtor, the *pro rata* value of the options resulting from Debtor's post-petition services comprise post-petition earnings that are excluded from the estate.

Consequently, upon exercise the present value of the options, which is the spread between the option price and the market price, must be divided between the parties on a *quantum meruit* basis. This is easily done, as contingencies in the Agreements mark nothing but the passage of time while Allen remained in Amoco's service. The conditions precedent are quantifiable. Whatever percentage of the time required for exercise of each group of options had passed before Allen filed his petition in bankruptcy, that percentage of option value is allocated to the bankruptcy estate. Whatever percentage of the time required for exercise of the options passed after the date of Allen's petition in bankruptcy, that percentage of the option value belongs to Allen.

Allen had undisputed right to exercise the First Group of options on the bankruptcy petition date. Terms of the 1995 Agreement required that he remain in Amoco's service for one year, or 366[1] days, before the First Group became exercisable. On January 10, 1997, he had remained with Amoco for more than 366 days. He had satisfied 100% of the conditions precedent to exercise. Therefore, 100% of the value of the options became property of the estate on January 10, 1997. Allen freely chose not to exercise the options,

---

1. The year 1996 was a leap year.

thus causing the options to remain contingent upon his continued employment. Allen could, of course, have chosen to terminate his employment with Amoco at any time before exercising his rights. In that event, the estate would not have any option rights, but Allen would not have the job that has paid him $133,200 in 1996 and awarded him options that are now worth more than $134,000. Debtor must therefore turn over to the Trustee all of his option rights in the First Group.

Terms of the 1995 Agreement required that Allen remain continuously in Amoco's for two years, or 731 days, before the Second Group became exercisable. On January 10, 1997, he had remained with Amoco for 653 days (March 28, 1995–January 10, 1997) of the 731 days required. He had satisfied 653/731, or 89% of the condition precedent to exercise of the Second Group. Seventy-seven (77) days remained to serve before he met the conditions (January 11, 1997–March 28, 1997). Thus, he needed to meet an additional 77/731, or 11%, of the condition precedent. This he did after his bankruptcy filing. Therefore, 89% of present value of the Second Group of options is property of the estate, and 11% of that value comprises earnings due to Debtor's post-petition services. Debtor must either turn over to the Trustee 89% of the Second Group of rights or the cash equivalent of their present value.

Terms of the 1996 Agreement required that Allen remain continuously in Amoco's service for one year, or 365 days, before the Third Group became exercisable. On January 10, 1997, Debtor had remained continuously in Amoco's employ for 290 days (March 26, 1996–January 10, 1997) of the 365 days required. He had satisfied 290/365, or 79%, of the condition precedent to exercise of the Third Group. He needed to remain with Amoco for an additional 74 days (January 11, 1997–March 26, 1997). He needed to meet an additional 75/365, or 21%, of the condition precedent. This he did post-petition. Therefore, 79% of the Third Group is property of the estate and 21% of the Third Group is earnings due to Debtor's post-petition services. Debtor must turn over to the Trustee 79% of the options from the Third Group or the cash equivalent of their present value.

Terms of the 1996 Agreement required that Allen remain continuously in Amoco's service for two years, or 730 days, before the Fourth Group became exercisable. On January 10, 1997, Debtor had remained continuously in Amoco's service for 290 days (March 26, 1996–January 10, 1997) of the 730 days required. He had satisfied 290/730, or 40%, of the condition precedent to exercise of the Fourth Group of the condition precedent to exercise of the Fourth Group. He needed to remain with Amoco for meet an additional 440 days (January 11, 1997–March 26, 1998). He needed to meet 44/730, or 60%, of the condition precedent. This he did post-petition. Therefore, 40% of the Fourth Group is property of the estate, and 60% of the Fourth Group is earnings due to Debtor's post-petition services. Debtor must turn over to the Trustee 40% of his rights in the Fourth Group or the cash equivalent of their present value.

As indicated, Debtor may turn over to the Trustee a sum of money representing the estate's share of the profit he would realize if he now exercised each group of options. If he chooses to turn over money in lieu of the options, he must pay to the Trustee an amount equal to 100% of potential profit (market price less option price less broker's charges) on the First Group, 89% on the Second Group, 79% on the Third Group, and 40% on the Fourth Group.

## CONCLUSION

For reasons set forth above and by judgments and orders to be entered, Debtor's Motion for Summary Judgment will be entirely denied, and Trustee's Motion for Summary Judgment will be entirely allowed.