**In re Gregory DIBIASE, Debtor.**

No. 01–52226C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Nov. 6, 2001.

Wendell H. Livingston, Malvern, PA, for creditor.

J. Todd Malaise, San Antonio, TX, for debtor.

### Memorandum Decision On Trustee's Objection to Exemptions Together With Motion For Turnover

LEIF M. CLARK, Bankruptcy Judge.

This is a case about stock options. The chapter 7 trustee claims that at least some portion of the options are non-exempt property of the estate, and should be available to be exercised—even if the exercise date occurs in the future, well after the bankruptcy filing. The trustee filed an objection to the debtor's exemption claim, along with a motion for turnover of the options. This memorandum sets out this court's ruling on the issue.

#### Background

Gregory Dibiase is an employee of Tesoro Petroleum Corporation. As an incentive to retain certain employees, and pursuant to an Employee Stock Option Plan,

Tesoro offered a stock option plan to these employees, one of whom was Dibiase. Tesoro and Dibiase executed, on October 24, 2000, a NonQualified Stock Option Agreement, bearing Grant Number 99–48. The agreement, in its first operative paragraph, granted the debtor "... a nonqualified stock option ... to purchase 5000 shares of the common stock of the Company, $16b par value per share, at a price of $10.03125 per share ... subject to adjustment as provided in the Plan." The agreement went on to specify the terms on which the Option could be exercised: the debtor/employee could purchase no more than 1250 shares (one-fourth of the total shares available under the Option) per year, beginning no earlier than the first anniversary of the agreement, plus one day. The debtor/employee did not have to exercise the Option on this schedule, but could instead "save up" the Option,[1] though in all events the Option would have to be exercised before the tenth anniversary of the agreement. If, at any point within the first four years, Dibiase ceased to be employed, then the terms of exercise were altered. If he ceased to be employed within the first year of the agreement, he lost the right to exercise the Option at all. If he terminated employment in the second year, he retained the right to exercise one-fourth of the Option (*i.e.*, 1,250 shares), and so forth. If the employee was terminated any time after the fourth year, he still retained the right to exercise the entire Option.

On May 10, 2001, some six months before the first anniversary of the agreement, Gregory Dibiase filed for chapter 7 bankruptcy. Helen G. Schwartz was appointed as trustee. On July 3, 2001, the debtor filed amended schedules claiming this Option as exempt under the "wild card" category of the federal exemption scheme. *See* 11 U.S.C. § 522(d)(5). He had already used up all the value of the wild card on other assets, but maintained that he could still claim the Option as exempt because it added no dollar value to the total of assets claimed under section 522(d)(5). He valued the Option at "zero" on the theory that, as of the date of the bankruptcy filing, the Option was "not vested."

The trustee objected to the debtor's claiming the Option as exempt, and also sought turnover of the Option, to the extent that the options could be attributed to the debtor's pre-petition employment.[2] With regard to the exemption question, the trustee maintains that the Option does not have to "vest" to be considered property of the estate, and that therefore the Option has some value greater than zero as of the date of the filing. If she is correct, then as a matter of law, the debtor will not be able to shelter the Option under the wild card exemption, and no other

---

1. Thus, for example, the debtor/employee could choose not to purchase any stock on the first anniversary, or even the second anniversary, but decide to purchase stock on the third anniversary, in which event he would be permitted to purchase 3750 shares at the option price specified (1/4 plus ¼ plus ¼ = 3/4).

2. The trustee's limited turnover request was based on her reading of the limited case law on how stock options are to be handled in bankruptcy. *See Allen v. Levey (In re Allen)*, 226 B.R. 857 (Bankr.N.D.Ill.1998); *In re Lawton*, 261 B.R. 774 (Bankr.M.D.Fla.2001).

Both of those cases posit an equitable allocation of the stock options based on a formula that calculates what percentage of the option is "attributable" to the debtor's pre-petition work. That percentage goes to the trustee. The remainder, according to these two cases, does not even come into the estate, but stays with the debtor. For reasons more fully explained later in this opinion, this court does not at all agree that there should be any such allocation, but the decisions in *Allen* and *Lawton* explain why the trustee thought that was all to which she was entitled.

exemption category is available for the Option (meaning that the trustee's objection to exemption would have to be sustained). If the exemption claim does not work, the debtor contests the percentage of the Option to which the trustee should be entitled, arguing over the application of the same allocation formula to which the trustee's pleading adverts. *See* note 1 *supra.* The trustee claims that, by virtue of the *Allen* formula, she is entitled to 54.9% of the first quarter of the option, exercised in the first year of the option agreement, and a declining percentage for each following year through year four of the contract. Because the options are actually exercisable *in futuro*, the trustee requests an order that would have a prospective effect for the next few years.

To recap, then, there are two issues presented here. The first issue—whether the Option can be claimed as exempt under section 522(d)(5)—depends on whether the Option was vested on the date of filing such that it had some value greater than zero. The second issue—the percentage of the Option to which the trustee is entitled—depends on an analysis of the *Allen* allocation formula. We shall discover, with regard to this second issue, that, in fact the *Allen* allocation formula, for reasons set out in this opinion, should be rejected in its entirety, rendering that issue essentially moot. Both issues, however, rely on a fairly straightforward analysis of "property of the estate" as that concept is applied to employee stock options.

### ANALYSIS

There are no Fifth Circuit cases construing how to handle employee stock options. The trustee cites a number of bankruptcy cases, all of which hold that a debtor's employee stock options, awarded pre-petition, constitute assets that become part of the bankruptcy estate upon filing, even if the debtor only becomes entitled to

actually exercise the options post-petition. *See Allen v. Levey (In re Allen),* 226 B.R. 857, (Bankr.N.D.Ill.1998); *In re Lawton,* 261 B.R. 774 (Bankr.M.D.Fla.2001); and *In re DeNadai,* 259 B.R. 801 (Bankr. D.Mass.2001); *see generally* 11 U.S.C. § 541(a)(1) (estate consists of all of the debtor's legal and equitable interests in property as of the commencement of the case). There are no contrary cases.

■ Section 541(a)(1) of the Bankruptcy Code defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This generous provision sweeps into the bankruptcy estate *all* interests held by the debtor—even future, non-possessory, contingent, speculative, and derivative interests. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983) (discussing the expansive reach of § 541); *Matter of Wischan,* 77 F.3d 875, 877 (5th Cir.1996) (§ 541 of the Bankruptcy Code encompasses "all legal and equitable interests of the debtors as of the commencement of the case" as property of the estate). Any interest of the debtor in property, created or received prior to the bankruptcy petition filing date will be property of the bankruptcy estate. With regard to the stock option in this case, then, the court needs only to determine whether the debtor acquired in interest in the Option prior to bankruptcy, and if so, then to determine the extent of the debtor's interest in the Option as of the filing.

### I. WHAT WAS GRANTED AND WHEN WAS IT GRANTED

The debtor commenced this bankruptcy proceeding on May 10, 2001. Some seven months earlier, on October 24, 2000, the debtor and his employer, Tesoro Petrole-

um Corporation, entered into the "Non-qualified Stock Option Agreement" described earlier in this decision. There is no ambiguity whatsoever with regard to what was granted and when it was granted. *What* was granted was *the Option,* which is a right to purchase property *in futuro* at a preset price. The value of this particular property right lies in its pre-set price, which on average can be expected to be lower than the market price one would otherwise have to pay for the stock at a point in the future.[3] *When* the Option was granted is clear on the face of the agreement: "... on October 24, 2000 (the "Date of Grant"), the Company hereby grants to the Optionee a nonqualified stock option (the "Option") to purchase 5,000 shares of common stock of the Company ... at a price of $10.03125 per share."

II. WHAT WAS THE EXTENT OF THE DEBTOR'S INTEREST IN THE OPTION AS OF FILING (OR DIVESTING THE NOTION OF VESTING)

The debtor's exemption claim was premised in part on the notion that the Option in this case had not "vested," *i.e.,* that in some sense the debtor did not have "ownership" of the Option. The source of this argument is the paragraph that sets out the terms for exercising the Option. That paragraph is denominated "Vesting Schedule," and lays out the exercise schedule described earlier in this decision. There are two essential features to this schedule. First, the debtor/employee can only buy so much stock at a time using the Option (no more than 1/4th of the available 5,000 shares annually, commencing one year after the agreement). Second, the debtor/employee can lose the right to exercise the option in whole or in part, depending on when and whether his employment is terminated. The debtor argues, in essence, that, as of the filing, he had not worked long enough to earn the right to use the Option, so the Option had not "vested," meaning that, as of the filing, the debtor essentially owned nothing.[4] While he values the option at "zero" the real thrust of the debtor's argument is that the Option was not property of the estate as of the date of filing.

The debtor's argument fails, for a number of reasons. Firstly, the argument fails because, as a matter of contract construction, the so-called "vesting schedule" is not in fact a vesting arrangement as that term might normally be used. Secondly, the

---

3. All markets are inherently uncertain and no one would dare to guarantee that the market for a given stock will always increase. On average, however, the stock market has, over the long term, risen in value over the years, the theory that underlies the retirement planning of most Americans. *See, e.g.,* "Smart guidelines for the successful investor" Copyright © 1999 National Association of Investors Corporation, at http://www.oysa.org/guide.html. More to the point, however, it is the *certainty* of the price that has value. Consider this: two persons intend to purchase stock in Company A one year hence. One has a pre-set guaranteed price, the other does not. If the stock goes up, the one with the pre-set option price makes money on the purchase by being able to purchase at a below-market price. If the stock goes down, both purchase the stock at the lower market price. The one holding the option does not lose in the event of a downturn, because the option was a grant, costing the holder no money. But only the one with the option makes money in the event of an upturn. Therefore, as of today, one year in advance, the one holding the option has something of value, an advantage over the one without the option.

4. Alternatively, the debtor also argued that, if the debtor owned anything as of filing, it was only a fraction of the Option equal to ratio between the total number of days he would have to work to be entitled to all of the Option (365 days × 4 years) and the number of days he worked between the date the contract was signed and the day he filed bankruptcy (198 days).

argument fails because, under Texas law (the law applicable to making property of the estate determinations in this case), vesting is irrelevant—the Option is property as of the filing without regard to "vesting." Thirdly, the whole notion of vesting as a basis for allocating property rights between the estate and the debtor, growing out of the *Allen* decision, is flawed at its core, confusing as it does the operation of a condition precedent with the operation of a condition subsequent. Each of these points is discussed below.

### A. As a Matter of Contract Construction, the NonQualified Stock Option Agreement Makes No Provision for "Vesting."

The debtor must, of necessity, place great weight on the title of the second operative paragraph of the Nonqualified Stock Option Agreement, denominated "Vesting Schedule." However, the *body* of the paragraph makes no reference whatsoever to "vesting" of the *Option*. The entire subject matter of the paragraph is a schedule for the *exercise* of the options. There is, of course, a clear difference between *owning* an Option (vesting) and the conditions for *using* the Option (exercising). A general rule of contract construction is that, absent ambiguity, the more specific provisions of a contract will control over the more general terms. *See generally Weingarten Realty Investors v. Al-*

*bertson's, Inc.,* 66 F.Supp.2d 825, 839 (S.D.Tex., 1999) (holding "no one phrase, sentence or section [of a contract] should be isolated from its setting and considered apart from the other provisions"); *see also Hinojosa v. Housing Authority of the City of Laredo,* 940 S.W.2d 763, 766 (Tex. App.—San Antonio 1997, no writ) (general terms are overcome and controlled by specific language dealing with same subject). Often, contracts will use general titles, primarily for the convenience of the parties and for ease of reference, though the more specific content of the paragraph itself will, under Texas law, control. *See id.; see also City of San Antonio v. Heath & Stich, Inc.,* 567 S.W.2d, 56, 59 (Tex.Civ.App.—San Antonio 1978 writ ref. n.r.e.). The paragraph entitled "vesting schedule" in fact describes not a vesting program at all but rather a schedule for *exercising* the Option. The paragraph in no way diminishes the unqualified grant of the *Option* in the immediately preceding paragraph (and remember, it is the *option* that is the property we are talking about, not the stock that can later be purchased using the option).[5]

Stock options may be contrasted with retirement benefits, which are often the subject of a vesting schedule. A given employer may offer, as part of its benefits package, the ability to receive certain payments upon retirement, but only if the employee remains employed for a period of

---

5. Options, it will be seen, share some of the qualities of a stock "call," which is nothing more than a right to purchase a given number of shares of a company at a given pre-set price on a given future date. The right to purchase at a preset price is an asset that has value—which is why stock calls are themselves bought and sold. The nature of the property right is defined by such features as the option price and the strike date, of course, but these features do not prevent the option from being property in its own right. The right to purchase is a species of intangible personal property, *See generally* 11 U.S.C. § 101(16), (49) (2000) (stock options are a right to purchase); *In re Tobiason,* 185 B.R. 59, 63 (Bankr.D.Neb.1995) (concluding that a stock option was property of the estate): Also, it is clear that options, by their nature, are exercisable in the future, and so typically contain a date before and a date after which the option cannot be exercised. These exercise limits do not make the option any less a real interest in property as of the date of the grant, any more than strike dates prevent stock calls from being tradeable.

years. For the first number of years, the employee has no retirement benefits. After the passage of a specified number of years, the employee has retirement benefits, which are said to have "vested." *See, e.g., Matter of Marriage of Reinauer,* 946 S.W.2d 853, 855 (Tex.App.—Amarillo 1997, no writ) (serviceman accrued entitlement to benefits by years of service, which fully vested after twenty years). In the case of options, by contrast, the grant is immediate, though their usage may be subject to conditions subsequent. In both cases, future events may alter or destroy the value of the asset, but in one case, a future event must occur *before* the employer has a duty to confer the benefit (the retirement benefit scenario). In the other case, a future event, if it occurs, may *excuse* the employer from having to honor its present obligation (the options scenario).[6] Only the first scenario accurately describes a true "vesting." *Cf. Continental Coffee Products Co. v. Cazarez,* 903 S.W.2d 70, 81 (Tex.App—Houston [14th Dist.] 1995), *rev'd on other grounds,* 937 S.W.2d 444 (Tex.1996) (a relevant damage calculation in a personal injury action was total loss of retirement benefits, resulting from employee's termination as a result of injury one year before vesting). The Option in this case was in fact fully "vested" in the sense that the employee had a present ownership claim in the *right* to purchase stock at a preferential pre-set price, a right which was subject to limitations in its exercise and subject to defeasance only by the occurrence of specified future events.[7]

For these reasons, the court concludes that, as a simple matter of contract construction, the debtor's interest in the Option was, as of the date of the filing, "fully vested" (to the extent that phrase has any legal significance). That is to say, what the debtor owned as of filing was an Option, albeit an option subject to certain limitations and to the possibility of defeasance by later events.

B. AS A MATTER OF TEXAS LAW, THE OPTION WAS PROPERTY OF THE DEBTOR AS OF THE DATE OF THE BANKRUPTCY FILING, REGARDLESS OF "VESTING."

 The Bankruptcy Code does not define the expression "interest in property." However, the Supreme Court has said that the term is intended to be construed broadly and encompasses every right and interest cognizable under non-bankruptcy law. *See generally Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966) ("the term 'property' has been construed most generously and an interest is not outside its

---

6. We have here described the bedrock distinction in contract law between the operation of conditions precedent and conditions subsequent. The distinction is discussed at some greater length later in this decision. *See* discussion *infra.*

7. For what it is worth, Professor Arthur L. Corbin, of Yale University and the author of the well-known treatise on contract law, had little use for the word "vesting" as a useful legal term:

> The terms "vested right" and "expectancy" are troublesome terms that have often been used to explain a decision without explaining it. The ideas behind them are so variable and uncertain as to make their use both deceptive and confusing. It is clear that the fact that rights are future and conditional does not prevent their recognition and protection; they are within the protection of the Constitutional provision against impairment of obligation by a state. A contract creating such rights is legally effective according to its terms; ... the existence of a "contract right" is not denied merely because the money is payable in the future and only on the happening of an uncertain event or because someone has a power of termination or modification.

ARTHUR L. CORBIN, CORBIN ON CONTRACTS (ONE VOL. ED.), § 626 at pp. 582–83 (West 1951).

reach because it is novel or contingent or because enjoyment must be postponed"). The Supreme Court has also said that determinations of property rights in the context of bankruptcy are left to state law. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *see generally Field v. Transcontinental Ins. Co.,* 219 B.R. 115, 119 (E.D.Va. 1998) (the "right to bring a 'bad faith' claim accruing post-petition against an insurance company that denied the debtor insurance coverage, refused to defend the debtor in a personal injury lawsuit, and refused to settle the claims against him was, under Virginia law, an interest in property"); *In re Segerstrom,* 247 F.3d 218, 224 (5th Cir.2001) ("the district court's reliance on state law to define a debtor's rights in property based on the debtor's post-petition conduct is inconsistent with [*Butner's*] organizing principles of bankruptcy estate law")[8]; *see also Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 252 (5th Cir.1988); *Matter of Wheeler,* 137 F.3d 299, 300–01 (5th Cir. 1998) (state law consulted to determine whether the debtor, as opposed to someone else, had a property interest in a right of action as of the commencement date); *Matter of Educators Group Health Trust,* 25 F.3d 1281, 1283 (5th Cir.1994) (state law consulted to decide whether a right of action accrued pre-petition, and hence belonged to the estate, or post-petition); *In the Matter of Yonikus,* 996 F.2d 866, 871 (7th Cir.1993) (holding that a potential personal injury claim and a potential workers' compensation claim were cognizable as property under state law and so were property of the bankruptcy estate); *In re Dias,* 37 B.R. 584, 587 (Bankr.D.Idaho 1984) (a debtor's contingent interest in the corpus of a trust subject to divestment until the debtor reached the age of 25 was an interest in property recognized under Idaho law, although the debtor's 25th birthday was 15 months away from the date of the filing); *Competrol Acquisition Partnership L.P. v. Flag Wharf, Inc.,* 203 B.R. 914, 917 (Bankr.D.Del.1996) (court looked to Massachusetts law to determine that an option to purchase property constituted an interest in property).

■ Texas courts indeed recognize that stock options constitute a species of property, capable of division in a divorce proceeding, for example. *See Charriere v. Charriere,* 7 S.W.3d 217, 219 (Tex.App.—Dallas 1999, no writ) (holding that stock options became community property when granted, capable of division upon dissolution of the marriage). The *Charriere* court reasoned as follows:

> ... Under [the stock option] agreement, the options granted to Valerie were exercisable any time after the grant date and before the "option termination date." Thus, under the agreement, Valerie had the right to purchase all 80,000 shares of Thermolase stock during the parties' marriage. In addition, under the agreement, once Valerie exercised her option, she enjoyed "ownership of the shares," including the right to vote the shares and receive dividends. Thus, it appears that, under the agreement, the optioned shares (1) were available for purchase during the marriage; and (2) once purchased, included potentially valuable rights. Under these circumstances, we conclude ... [that] the options, which were acquired and exercisa-

---

**8.** The debtor in *Segerstrom* stated post-petition that she thought that the insurance company had properly handled her claim. The insurance company claimed that, as a result of this statement, the debtor's trustee could not maintain a *Stowers* action against the insurance company for failing to take a settlement, resulting in a substantial judgment against the insured. *Id.*

ble during marriage, were community property subject to division as part of the parties' community estate.... *Id.* One party in *Charriere* argued that the stock options could not be divided by the court because their exercise was dependent on whether the spouse continued to be employed at that company. The *Charriere* court responded to the argument as follows:

> We recognize that, to the extent the value of the options is dependent on Valerie's post-divorce employment, she can control the value of those options to Charles (*i.e.*, she can terminate her employment and effectively deprive him— and herself—of any value those options would have had over time). However, the fact that the value associated with some or all of the options could be forfeited by the occurrence of certain contingencies (*i.e.*, Valerie's termination of employment with the company) does not divest the options of their status as community property. *See Busby v. Busby,* 457 S.W.2d 551, 553 (Tex.1970) (recognizing that portion of military retirement benefits could be community property even though any value associated with benefits could be forfeited if husband was dishonorably discharged from military); *Mora v. Mora,* 429 S.W.2d 660, 662 (Tex.Civ.App.—San Antonio 1968, writ dism'd) (noting that rights under military retirement plan were not divested of status as community property merely because rights could be forfeited if certain contingencies occurred); *see also Cearley v. Cearley,* 544 S.W.2d 661, 665 (Tex.1976). ·

*Id.,* at 220. Thus, the court concluded that the occurrence of a later event (such as termination of employment) that might alter or destroy the value of the option *in futuro* would not alter the status of the stock option as property at the current time. In Texas, stock options are considered to be a present interest in property, even if they may be forfeited in the event of future contingencies.

Indeed, even so-called "unvested" stock options constitute, in this state, a present contingent interest in property subject to consideration along with other property capable of equitable distribution by a court in the dissolution of a marriage. *See Cearley v. Cearley,* 544 S.W.2d 661, 666 (Tex. 1976); *Bodin v. Bodin,* 955 S.W.2d 380 (Tex.App.—San Antonio 1997, no writ); *accord Kline v. Kline,* 17 S.W.3d 445, 446 (Tex.App.—Houston 2000, rev. den.). Stock options granted by an employer— even options subject to a contingency such as continued future employment, or subject to limitations on their exercise—are thus nonetheless property in which a debtor has a legal or equitable interest cognizable under Texas law. If the interest is so cognizable, then it is also, of necessity, an interest of the debtor in property that comes into the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). In this case, as in *Charriere,* the debtor, on the day he filed bankruptcy, owned the stock option granted to him by his employer. Just as in *Charriere,* the limitations on the exercise of the option *in futuro* do not change the fact that the option itself was property owned by the debtor on the day he filed bankruptcy.[9] And just as in *Cearley,* even a finding that the option in question was not yet *vested* would not alter the conclusion that the debtor nonetheless owned the option on the day he filed bankruptcy.[10]

---

**9.** The Bankruptcy Code recognizes stock options as a kind of security. 11 U.S.C. § 101(16). Securities owned by a debtor as of the date of filing become property of the estate. *See In re Allen, supra,* at 862.

**10.** In this case, the option was clearly "vested", though there are limitations on how and

■ This analysis furnishes the answer to the debtor's exemption claim. It will be recalled that the debtor's exemption claim depends on whether the Option had any value greater than zero as of filing, because the debtor had already used up all of the dollar value of his wild card exemption on other assets. *See* 11 U.S.C. § 522(d)(5). Even though the Option cannot be exercised immediately after it is received (and even though, as of the bankruptcy filing, the debtor was not yet eligible to exercise the option, having worked for less than a year), the debtor nonetheless unequivocally owned the *right* when the option was granted (and he was in fact employed when he filed, so there was no failure of a condition subsequent as of the filing). On the day the debtor filed bankruptcy, he owned an absolute right to purchase Tesoro stock at a set price in the future. That right, like any such right, has some value. In this case, it need only have a value greater than zero—$100, $10, $1.00 or even a penny!—and it will automatically not qualify for exemption in this case.[11] Only if the Option was worth zero ($x + 0 = x$) could the debtor claim it as exempt under § 522(d)(5). If the Option was worth anything more than 0 (let's call that value $n$), then the option would no longer be sheltered ($x + (n>0) = x + n$). Regardless what this option is worth, it is at least clear that it is worth *something*, because it represents a vested right to purchase stock *in futuro* at a pre-set price.[12] *See* note 3 *supra.* Thus, the option cannot

be claimed as exempt property under § 522(b).

C. No Part of the Option Can be Allocated to the Debtor under the Allocation Formula in *Allen*, Because *Allen* is Wrongly Decided.

■ The Option—the entire Option— belongs to the estate. The debtor nonetheless argued (and the trustee, it seems, acceded, at least in principle) that a portion of the Option ought to be *excluded* from the estate, because it is, under the *Allen* allocation formula, attributable to post-petition efforts of the debtor. As the estate may only consist (with a few minor exceptions) of a debtor's interest in property as of the date of filing, any interests which come into existence post-petition do not become property of the estate (argues the debtor). The proposition is correct as a general principle. It does not apply here, however, notwithstanding the analysis in Part II of the *Allen* decision that led to the development of the allocation formula to which we have made continuing reference thus far in this decision. *See Allen v. Levey (In re Allen)*, 226 B.R. 857, 868 (Bankr.N.D.Ill.1998); *see also In re Lawton*, 261 B.R. 774 (Bankr.M.D.Fla.2001).

The allocation formula in *Allen* seems to have grown out of that court's concern that the trustee would have the benefit of the option even though its exercise *in futuro* depended on whether the debtor continued to work at the company post-petition, con-

---

when the option can be exercised. *See* discussion *supra.*

**11.** *See* discussion *supra* at note 3. Of course, the debtor might choose to destroy the value of the Option post-petition by quitting his job, but that would not alter the approach to valuing the Option, because valuation is done as of the filing (as that is when the exemption is determined). *See Matter of Sandoval*, 103 F.3d 20, 22 (5th Cir.1997). Then again, as a practical matter, if the debtor terminated em-

ployment at any time before claiming the exemption, then there would be nothing left to claim as exempt, so the point has, at best, only theoretical value.

**12.** The option price today is slightly below the quoted price for Tesoro stock—and "today" is about two months after the dreadful events of September 11, 2001, which caused the entire stock market to shed value.

ferring what that court saw as an unjustifiable windfall, generated for the most part by the efforts of the debtor. Even though the *Allen* court virtually tracked the "property of the estate" analysis set out in this decision in Part I of its own opinion, it nevertheless found itself unable to live with the consequences of its own logic. In Part II of its decision, the *Allen* court focused on the *value* of the Option there in question, and what that court perceived as the apparent causative connection between the debtor's continued employment and the "future realizable value" of the Option. Said the court:

> the actual value to the estate of contingent future interests must be equal to the value of the debtor's interest on the petition filing date. The extent of the bankruptcy estate's interest in property cannot exceed the interest possessed by the debtor at the commencement of the case.... The realized or realizable value of an interest that was contingent at the time of filing is property of the estate only to the extent that the subsequently realizable value is related to pre-petition actions of the debtor.

*In re Allen*, 226 B.R., at 867. The court then analogized the allocation of "realizable" value that it proposed to the *quantum meruit* allocation mechanism that a court might employ in dividing up a lawyer's contingent fee when the lawyer files bankruptcy and the lawyer's contingent fee case is ongoing. *Id.* Seductive as the reasoning seems at first blush, it will not withstand scrutiny, however.

The *Allen* court's first error is in confusing the future *value* of a given stock option with the estate's present *interest* in the option. Future events can indeed have an impact on the future value of a stock option—market conditions, the debtor's future employment with the company, the company's own business prospects all can have an impact. The mere fact that some of an asset's eventual value might be affected by post-petition events, however, should not of necessity affect the independent determination whether the estate owns all or only a portion of an asset.[13]

*Allen* itself ruled in Part I of its opinion that *all* of the option was property of the estate as of filing, agreeing with this court. Yet *Allen* in Part II relies on *quantum meruit* principles, because, in the court's view, the debtor's post-petition actions *add* or *create* value post-petition, such that the debtor "earns" or "creates" not just the value of the option but a portion of an *interest* in the option (called by the *Allen* court "realizable value") by continuing to be employed. Indeed, this notion of "earning" is reinforced when the *Allen* court suggests that some portion of the Option may actually represent some species of post-petition *earnings*. *See Allen, supra* at 866.

The *Allen* court had already boxed itself in with its earlier analysis that the Option, though in some sense contingent, is nonetheless property of the estate, eliminating the court's ability to claim that the Option is *directly* attributable to earning activity—like a salary for example.[14] Yet the

---

13. An obvious example: the estate succeeds to the debtor's interest in a lawsuit against a company. Post-petition, before the suit goes to trial, the debtor (and principle witness) dies. Or, alternatively, post-petition, the debtor (and principle witness) testifies. One event diminishes the future value of the asset. The other event enhances the value. Neither event in any way affects the estate's unquali-

fied ownership of the lawsuit as an asset of the estate on the date the bankruptcy case is filed.

14. Of course, with regard to a salaried individual who files chapter 7 bankruptcy, paychecks earned pre-petition (even if received post-petition) are property of the estate, while paychecks earned post-petition are clearly not

notion of "earning" is essential to the court's holding of "realizable value" attributable to the debtor's post-petition "efforts," so the court relies instead on the "earnings exclusion" found in section 541(a)(6). *Id.*[15] To make the logic work, the court suggests that the debtor "earns" the right to *exercise* the option, and that this "exercise" is some species of property independent of but somehow growing out of the underlying option—a kind of "proceeds of property" attributable to the debtor's individual post-petition services (*i.e.*, his continued employment). Says the court:

> Because Debtor's contingent contract rights became property of the bankruptcy estate on January 10, 1997, his subsequent rights to exercise them, which continued and still existed post-petition, may be interests in property acquired

post-petition under § 541(a)(7). But they are certainly matured rights that comprise proceeds and profits from the original property of the estate under § 541(a)(6).

*Id.* The *Allen* court, unfortunately, finds itself ruling *both* that the entire option is property of the estate on the date of filing, *see id.*, at 866, *and* that some portion of the option is post-petition proceeds subject to the earnings exception in section 541(a)(6). *See id.*, at 867. For that conclusion to stand, the option must be both the property of the estate and the proceeds of itself (because the earnings exception in section 541(a)(6) applies only to proceeds of property of the estate). The logic does not work. The option cannot be both the property that comes into the estate upon filing and the proceeds of itself.[16]

---

an interest of the debtor in property *as of filing*—they come into existence post-bankruptcy and so are not property of the estate. *Allen* correctly realized that the sort of incentive-motivated stock option at issue is not "earned" in the sense that a salary might be "earned." *See Matter of Baldwin–United Corp.*, 52 B.R. 549, 551 (Bankr.S.D.Ohio 1985) (stock option rights given as an inducement were not in the nature of wages, but were instead perks designed to increase the attractiveness of employment and to align the employees' interests with that of the company).

**15.** Section 541(a)(6) includes a certain category of property of the estate, then contains a special exclusion of a subset of that category of property:

> [The] estate is comprised of all the following property, wherever located and by whomever held:
>
> . . .
>
> Proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

11 U.S.C. § 541(a)(6). The category created by subsection (6) is property generated post-petition by pre-petition property that has come into the estate. The subcategory exclu-

sion is any *such* property (*i.e.*, subcategory (6) property, such as proceeds or profits) that is properly characterized as earnings from services performed by an individual debtor. The section 541(a)(6) exclusion is *not* the device that shelters an ordinary individual debtor's post-petition salary—those funds are already sheltered because they are (a) generated post-petition and (b) do not arise out of pre-petition property that may have come into the estate. *See* 11 U.S.C. § 541(a)(1). The section 541(a)(6) exception is a much narrower exclusion designed to shelter the proceeds of a closely held business, such as a medical practice. Indeed, that is the context that has generated the most interesting litigation regarding the nature of the earnings exclusion. *See generally In re Herberman*, 122 B.R. 273 (Bankr.W.D.Tex.1990); *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988).

**16.** And only sophistry could make the "right to exercise" an option a separate property interest. After all, an option that does not include the right to use it is no option at all, as an option itself is nothing more than the right to buy something in the future at a preset price. By its very nature, an option *is* a present *right* to *do* something in the future. If the something that one is to do in the future in fact is only acquired by future actions, then

The essential error in the *Allen* court's reasoning can, it seems, be traced back to a confusion over the difference between conditions precedent and conditions subsequent. The *Allen* court evidently thought that the exercise provisions in the stock option agreement operated as a kind of vesting mechanism, so that the debtor "earned" options by staying employed—a kind of condition precedent. In fact, however, the agreement in *Allen* (and the agreement in this case) provided that the option (or in our case some of the benefit of the option) may be *forfeited* if the employee *ceases* to be employed—a condition subsequent. The former scenario more closely resembles the mechanism one often finds being used to confer retirement benefits on an employee—the employee does not obtain an unqualified right to demand the benefit on retirement until the employee has worked a certain number of years.[17] Only then might one say that the benefits have "vested" such that they ought to be treated as a present interest in property. Ownership, under that set of facts, is subject to a condition precedent. The latter scenario, by contrast, is more like, say, a scholarship that is granted to a student, containing a proviso that the student must maintain a certain grade point average, for example or lose the scholarship. The grant is immediate, but it is subject to revocation. Options are not normally earned like retirement benefits.[18] They may be subject to revocation or reduction or forfeiture, but they are not earned simply because the employee stays employed, any more than one would say that a scholarship was "earned" just because the student stayed in school.[19]

there is, in fact, no "present right"—no present option. All that an estate would acquire under that set of facts would be the ability to earn the option in the future (just as one might earn retirement benefits). That is not our facts, however. Nor was it the facts in *Allen*.

17. *See* discussion *supra*.

18. There is an obvious exception, of course. Many companies compensate their executives with stock options on an annual basis, tied directly to the performance of the company, on the theory that positive performance by the executive leads to profitable performance of the company. The stock options in that scenario do represent compensation for work done and are truly earned. Often the executive will have an employment contract with the company that provides a formula for the award of stock options, tied to company performance benchmarks. That sort of arrangement is not present here. The "nonqualified stock option agreement" here does not provide for the award of stock options on a formula tied to performance. It grants the entire option at the front end. The stock option grant is not tied to performance. It is instead self-denominated as an "inducement" to the employee to stay employed and not to leave. *See Matter of Baldwin–United Corp.*, 52

B.R. 549, 551 (Bankr.S.D.Ohio 1985) (court held as a factual matter that stock option rights were not in the nature of wages but were perks to increase the attractiveness of employment and to align the employees' interests with that of the company.)

19. As venerable an authority as *Corbin* takes us back to first principles with a clarity that bears quotation:

[A] "condition" ... is defined as an operative fact, one on which the existence of some particular legal relation depends.... This means that it is a fact or event that affects legal relations; it is a cause of some change in those legal relations.
[B]efore speaking of a conditioning fact or event as a condition precedent or a condition subsequent we must know what it is to which we are relating it. Precedent to *what*? Subsequent to *what*? ... The use of these two terms is often very puzzling; and the reason is that they are used with respect to a fact or event, without indicating in any definite way what it is to which it is being related.
Conditions precedent ... are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of

The "condition precedent" that the *Allen* court presumed was the debtor's continued employment.[20] But "continued employment" is not a new fact or event that *creates* the right to exercise the option. It is the *status quo ante*. The "new fact or event" that the option agreement contemplates is *termination* of employment, in which case the existing rights under the option are *forfeited*. That describes the operation not of a condition precedent, but of a condition subsequent.

Here is another way to think about the distinction between conditions precedent and conditions subsequent in the context of this option: Suppose the employer in this case decided to revoke the option 100 days after the agreement—well before the date of first exercise. By the facial terms of the agreement, the employee would not have to wait another 265 days before bringing a suit for breach. He could sue immediately. The debtor does not have to work 265 more days before bringing his suit, because that is not a condition precedent to the present existence of the employer's duty (and hence the existence of

the breach). The plaintiff does not have to plead "I have been working for 365 days" as an essential element of his cause of action for breach of contract, because that is not a condition precedent to performance by the company.[21] By contrast, if the employee is terminated two days before the first exercise date, but later tries to exercise the option, the company will not honor the exercise of the option. The refusal to honor the option would, but for the condition subsequent, constitute a breach of the agreement. In a later suit by the employee to enforce the option (or sue for breach), the defendant company will properly plead, *as an affirmative defense*, that the employee was terminated, relieving the employer of the duty to perform. The condition subsequent relieves the defendant company of the duty to honor the option, excusing its non-performance. This allocation of pleading burdens is one way to distinguish conditions precedent from conditions subsequent. *See* FED.R.CIV.P. 9(c), 8(c). *Failure* of a condition precedent means that the defending party is relieved of the duty of

contract duty, before the usual judicial remedies are available.

Conditions subsequent ... are those facts and events that occur after breach of contract duty and that terminate the right to immediate performance and also the right to a judicial remedy. The term could be used to denote those facts and events that occur after a contract has been made and operate as its discharge and termination, without regard to whether there has been a breach or not. By this usage, the facts and events would be related to the primary contractual rights and duties, rather than to the right and duty of immediate performance and breach thereof.

... conditions will be either precedent to the duty of immediate performance (and its breach) or subsequent to that duty (and its breach).

ARTHUR L. CORBIN, CORBIN ON CONTRACTS (ONE VOL.ED.), §§ 627–28, at pp. 583–84, 585, 586, 587–88 (West 1952).

20. In crafting his allocation formula, the *Allen* judge said:

Terms of the 1995 Agreement required that [the debtor] remain in Amoco's service for one year, or 366 days, before the First Group [of stock options] became exercisable. On January 10, 1997, he had remained with Amoco for more than 366 days. He had satisfied 100% of the *conditions precedent* to exercise. Therefore, 100% of the value of the options became property of the estate on January 10, 1997. *Allen*, 226 B.R., at 867.

21. Though of course the company could, in its answer, insist that, if the option is reinstated, it could still not be exercised until the passage of time contemplated in the agreement. That mere passage of time, however, is not a condition precedent. In contract law, it is not even considered a condition at all. *See Corbin, supra* § 626 at 582.

ever having to perform in the first place—the benefit of the contract never arises. The *occurrence* of a condition subsequent means that the defending party is relieved of an otherwise pre-existing duty—the benefit of the contract is lost. With conditions precedent, it is the *plaintiff* that must plead the occurrence of the condition precedent, or face a motion to dismiss for failure to state a claim.[22] With conditions subsequent, it is the *defendant* that must plead the occurrence of the condition subsequent as an affirmative defense. *See* C. WRIGHT & A. MILLER, 5 FED.PRACT. & PROC.2D, § 1304 at 687 (West 1990); *Reynolds–Fitzgerald, Inc. v. Journal Publishing Co.*, 15 F.R.D. 403, 404 (S.D.N.Y.1954).

And this is why *Allen* is wrong. It presumes there must be a condition precedent, then casts about for an event that fills the bill, and arrives at "continued employment." Yet clearly continued employment is a *non-event*. It is the maintenance of the status quo. The essence of conditions is that they are future events or occurrences. Here, the relevant "event" is *termination* of employment, which, *if* it occurs, *relieves* the other party from performance. That is the very essence of a condition subsequent. The rights and duties between the parties are fully earned and *in esse*, subject to defeasance by a later occurrence. The debtor does not earn the right to use the Option in this case at all. It was granted the Option at the outset. The debtor can forfeit some or all of the benefit of the Option by quitting (or lose the benefit by being fired), but absent the occurrence of these events, the Option has its full value on the day it is granted. As of the filing, the debtor was employed, and thus owned the Option. There were no conditions precedent to its

ownership, though there were qualifications on how and when the Option could be used. The Option in *Allen* did not have to be earned. Neither does the Option in this case.

The *Allen* court seems to have succumbed to the understandable, but dangerous, impulse to do what it thought was equity in derogation of the plain import of the statute. This, a bankruptcy court cannot do—especially a bankruptcy court in this circuit. *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986) (section 105 of Bankruptcy Code "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity"). A straightforward reading of Section 541(a) and of applicable state law leads to an ineluctably straightforward conclusion: all of the Option (and all the rights and limitations that go with it) belonged to the debtor the moment immediately preceding filing, and so belong to the trustee in bankruptcy the moment immediately following filing.

Yet even if there were an "equitable exception" to the plain language of the statute and case law, the facts of this case in fact do *not* raise any particular equitable concerns that would demand special intervention by the courts. True enough, the *Allen* court was obviously troubled about what it perceived to be the inequities of the debtor losing the value of the stock options even though he continued to work. After all, those options were granted in the first place as an incentive to keep the employee at the company. With bankruptcy, the employee might keep working but would not enjoy the benefit of the incentive. And by continuing to work, he would *de facto* "add value" to (or at least not subtract value from) the Option. That,

---

**22.** Rule 9(c) does not require detailed pleading of conditions precedent, but does require an averment that all conditions precedent have been performed or occurred. *See* C. WRIGHT & A. MILLER, 5 FED PRACT. & PROC.2D, § 1302 at 679 (West 1990).

no doubt, is what motivated the *Allen* court to embark on its unfortunate course. But perceived inequities abound in the way the Bankruptcy Code affects the rights of creditors and debtors alike. There seems to be little about the conclusion this court reaches that is any more or less inequitable than are many other property of the estate outcomes.[23] There is nothing so unexpectedly inequitable or unfair about the outcome in this case as to compel this or any court to either ignore the statute or to place an unwarranted judicial gloss on the statute.[24]

In summary, then, the *Allen* formula is simply wrong, and should not be followed by this or any other court.

## CONCLUSION

For all of the foregoing reasons, the court's legal conclusions are simple and straightforward, though the eventual outcome of this case is not. The debtor's exemption claim will not stand, as the Option had value as of filing, but the debtor was out of "wild card" to shelter it. What is more, the exclusion argument will not stand either, as all of the Option became property of the estate as of filing and none of the Option ought to be "allocated" to post-petition efforts of the debtor. The allocation formula first designed in *Allen* and repeated in *Lawton* lacks a legal foundation and is here rejected.

Unfortunately, *Allen* and *Lawton* have already done their damage in this case, misleading both the trustee and the debtor. The formula invented by the court in *Allen* is designed to *exclude* part of the stock option from the estate, but exclu-

**23.** A debtor suffers an injury pre-petition, but the resulting claim for damages belongs to the trustee in bankruptcy—and the debtor must cooperate by testifying at trial post-petition! *See generally In re Ballard*, 238 B.R. 610 (Bankr.M.D.La.1999) (debtor's pre-petition personal injury action, including his claim for future medical expenses, was estate property; that debtor's prepetition claim for loss of post-petition earning capacity was also estate property; and that neither equitable nor practical considerations warranted giving debtor a portion of the settlement proceeds). Or the debtor files bankruptcy the day before he gets his bi-weekly paycheck—and has to turn it over to the trustee because it belongs to the bankruptcy estate. *See generally In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir.1984) (holding that earnings from services performed prior to bankruptcy but paid post-petition are property of the estate because such earnings do not arise from post-petition services of the debtor). A debtor's spousal support payments, which are not excludable as post-petition income, may come into the bankruptcy estate. *See In re Anders*, 151 B.R. 543 (Bankr.D.Nev.1993) (post-petition spousal support payments owing to Chapter 7 debtor-wife did not constitute "earnings," within the meaning of Section 541(a)(6), as payments were not derived from post-petition services performed by the debtor, and there-fore were not excluded from property of the estate pursuant to Section 541(a)(6)). A similar rule applies to military pension benefits payable to a spouse. *See In re Zrubek*, 149 B.R. 631 (Bankr.D.Mont.1993) (military pension benefits were not "wages" and therefore were not excluded from property of the Chapter 7 debtor's estate pursuant to Section 541(a)(6)).

**24.** The drafters of the Code accommodated the impulse to do equity, but not the way *Allen* did. Rather than creating a constellation of exceptions to what might be property of the estate, the Code instead gives individual debtors the right to *exempt* certain property, thus taking it back out of the estate. To the extent that stock options can be claimed as *exempt* under either the state or federal exemption schemes available to debtors by way of section 522, the debtor will be able to keep the options. However, courts are no more free to create new, non-statutory exemptions than they are to engraft non-statutory exclusions. *See United States v. Smith*, 499 U.S. 160, 167, 111 S.Ct. 1180, 1185, 113 L.Ed.2d 134 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent").

sions are not exemptions. *See generally Patterson v. Shumate*, 504 U.S. 753, 762, 112 S.Ct. 2242, 2249, 119 L.Ed.2d 519 (1992). We have found here that *Allen* is not good law with regard to its allocation formula, and should not be followed. The trustee, however, assumed that *Allen* and *Lawton*, the only cases directly on point on the issue, were controlling. She thus *conceded* to the debtor some portion of the stock option, based upon the allocation formula in those two cases.

 Now we are faced with an ironic outcome. The trustee could have received the entire stock option, because this court has found that there is no legally justifiable basis for "splitting" the asset along the lines proposed by *Allen*. But the court can award no more than what has been pleaded. Accordingly, the court can only enter an order sustaining the trustee's objection to exemptions, but awarding to her the proportion of the option for which she pleads, and no more.

An order will therefore be entered granting the relief requested in the trustee's motion.