**In re Ronald William CARLTON and Linda Jean Carlton, Debtors.**

**No. 00–32854–BKC–SHF.**

United States Bankruptcy Court, S.D. Florida.

March 3, 2004.

James S. Telepman, N. Palm Beach, FL, for creditor.

Thomas F. Ryan, Esq., Tequesta, FL, Jeffrey B. Lathe, West Palm Beach, FL, for debtors.

John L. Walsh, Ft. Lauderdale, FL, for trustee.

### ORDER GRANTING MOTION TO COMPEL TURNOVER

STEVEN H. FRIEDMAN, Bankruptcy Judge.

THIS CAUSE came before the Court on February 26, 2002, for an evidentiary hear-

ing on Trustee's Motion to Compel Turnover. Based upon the evidence presented, argument of counsel, and review of the court file, the Court finds as follows:

Ronald William Carlton and Linda Jean Carlton, filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 28, 2000. On the petition date, Ronald William Carlton (hereinafter, the "Debtor"), was an employee of Ameripath, Inc. ("hereinafter, the 'Company'") as its Director of Marketing and Business Development. In addition to salary received as a result of his employment with the Company, the Debtor was also a participant in the Company's Amended Stock Option Plan (hereinafter, the "Plan").

**The Option Agreements as of the Petition Date**

The Company grants Stock Options to employees under the Plan through contracts entitled "Stock Option Agreements" (hereinafter, the "Agreements"). Pursuant to the terms of the Agreements, the Company grants the employee/optionee the right to buy a specified number of shares of the common stock of the company at a specific price in the future as detailed in an Exercise Schedule. The Agreements provide that an employee's right to exercise the options and purchase shares of stock at the set price is contingent upon the employee remaining in the Company's employ on the exercise dates delineated in the Agreement.

The grant of options to any particular employee under the Plan is neither in lieu of salary nor based upon an employee's performance or management control in the company. Rather, the Plan is offered by the company as an incentive in addition to salary to attract and retain employees by encouraging stock ownership in the company.

In the instant case, the Company executed four Non–Qualified Stock Option Agreements in favor of the Debtor prepetition on September 9, 1997; May 29, 1998; April 8, 1999; and May 4, 2000; respectively. Each Agreement, in its first operative paragraph, granted the Debtor a Non–Qualified Option to purchase a specified number of shares of the Company's common stock. Specifically, the 1997 Agreement granted to the Debtor the option to purchase Five Thousand (5000) shares; the 1998 Agreement granted the option to purchase One Thousand (1000) shares; the 1999 Agreement granted the option to purchase One Thousand (1000) shares; and the 2000 Agreement granted the option to purchase Three Thousand (3000) shares. In total, the Debtor was thus granted four option contracts to purchase a total of Ten Thousand (10,000) shares of the Company's common stock.

The Agreements each specified the terms upon which the options could be exercised. In each Agreement, the Debtor was granted the option to purchase twenty (20%) percent (one-fifth of the total shares available under the Option) of the shares granted per year, beginning no earlier than the first anniversary of the grant date under the Agreement. The Agreements did not require the Debtor to exercise the options according to the Exercise Schedule. Instead, the Debtor could save up the Options over time and choose to purchase the stock that had accrued according to the schedule at a later date not to exceed ten years from the grant date. If, at any point during the term of the Agreements, the Debtor ceased to be employed by the Company, the terms of the Agreements governing the Exercise Schedule were altered according to paragraph 9(a) of the Plan.

In the event an employee leaves the employ of the company or dies, paragraph 9(a) of the Plan provides a time frame in which any accrued unexercised options ter-

minate and become null and void. Specifically, the plan provides that upon employment being terminated by the Company for any reason other than for cause, any accrued unexercised options will expire one year after the termination date. On the other hand, if employment is terminated by the Company for cause, the accrued unexercised Options expire immediately. Finally, if employment is voluntarily terminated by the employee, the accrued unexercised Options expire Ninety (90) days from the date of termination.

On the petition date, the Debtor was vested in all four option Agreements inasmuch as the Debtor was granted the Options under the Agreements and thus owned the rights to purchase the Ten Thousand (10,000) shares of common stock under said Agreements pre-petition. On the petition date, Two Thousand Six Hundred (2,600) shares of the Ten Thousand (10,000) shares granted had become exercisable under the terms of the 1997, 1998 and 1999 Agreements. On the petition date, the Debtor had neither exercised the accrued Options nor purchased any shares. The option to purchase these Two Thousand Six Hundred (2,600) shares became property of the bankruptcy estate as of the petition date. The options were not turned over to the Trustee but instead were sold post-petition as detailed *infra.*

Post petition, the Debtor's employment with the company was terminated pursuant to the terms of a Separation Agreement. Under the Separation Agreement, the Debtor's salary continued until September 24, 2001. From the petition date through the termination of employment on September 24, 2001, the Option to purchase Two Thousand additional shares of the Ten Thousand shares granted became exercisable under the terms of the 1997, 1998, 1999 and 2000 Agreements.

The Debtor did not list the Options in his petition or schedules. Further, he did not list the Options as exempt property in Schedule C. The Debtor claims he did not list the Options in his schedules or in the amendments because, in his opinion, they had no value on the petition date because the cost to exercise the Option and purchase shares would have exceeded the market value of the shares. There was no evidence presented as to the value of the shares on the petition date. The Debtor testified that, as of the date of the creditor's meeting, he revealed the existence of the Options to the Trustee and estimated the value of the Company's stock that date to be approximately $5.00 to $6.00 per share. Additionally, the Debtor filed amended schedules and did not list the Options in the amendments or claim them as exempt property.

Accordingly, this case involves the prepetition and post-petition accrual of Options to purchase a total of Four Thousand Six Hundred (4,600) shares of stock. Of the Options to purchase Four Thousand Six Hundred (4,600) shares that accrued pre and post petition in this cause, the Debtor, post-petition on two separate occasions, exercised Options to purchase Three Thousand Six Hundred (3,600) shares of stock under the 1997, 1998 and 1999 Agreements. To date, the accrued Options to purchase the remaining One Thousand (1,000) shares remains unexercised and in the possession of the Debtor.

### Exercise of the Options

Post-petition on November 11, 2000, the Debtor exercised the Option to purchase Three Thousand (3000) shares of stock under the 1997 Agreement. The Debtor sold all Three Thousand (3000) shares on the same date he exercised the Option. Of the Option exercised, the right to purchase Two Thousand (2000) shares accrued prepetition, while the right to purchase the

remaining One Thousand (1000) shares accrued post-petition. The Debtor's year 2000 individual tax return established that the Debtor realized Twenty Thousand Six Hundred Thirty ($20,630.00) Dollars as proceeds from the sale. These proceeds were not turned over to the Trustee.

On January 17, 2001, the Debtor exercised the Option to purchase Six Hundred (600) additional shares of stock that had become exercisable pre-petition under the 1998 and 1999 Agreements. He then sold all Six Hundred (600) shares on the same date he exercised the Option. According to the Option Summary dated April 2, 2001, (hereinafter, "Option Summary"), the price of Four Hundred (400) of the Six Hundred (600) shares sold under the 1998 Agreement was Fourteen and 06/100($14.06) Dollars. The Options Summary indicates that the Four Hundred shares sold for Twenty One and 437/1000 ($21.437) Dollars. Accordingly, the Debtor realized Two Thousand Nine Hundred Fifty and 80/100 ($2,950.80) Dollars as proceeds from the sale.[1]

With respect to the remaining Two Hundred (200) shares sold, the Options Summary indicates the price of these shares under the 1999 Agreement was Seven and 625/1000($7.625) Dollars. The Options Summary indicates that the Four Hundred shares sold for Twenty One and 437/1000($21.437) Dollars. Accordingly, the Debtor realized Two Thousand Seven Hundred Sixty Two and 40/100 ($2,762.40) Dollars as proceeds from the sale.[2] The total sum of Five Thousand Seven Hundred Thirteen and 20/100 ($5,713.20) Dollars[3] realized by the Debtor as proceeds from the January 17, 2001, post-petition exercise of Options and subsequent sale of stock were not turned over to the Trustee.

## The Options are Property of the Estate

11 U.S.C. § 541(a)(1) defines property of the estate to include all legal or equitable interests of the debtor in property as of the commencement of the case. This provision sweeps into the bankruptcy estate all interests held by the debtor-even future, non-possessory, contingent, speculative, and derivative interests. Any interest of the debtor in property, created or received prior to the bankruptcy petition filing date is property of the bankruptcy estate.

The case law on the manner in which stock options are to be handled in bankruptcy is limited. There are no Southern District of Florida or Eleventh Circuit cases construing how to administer employee stock options, in connection with a bankruptcy case. However, a number of bankruptcy cases in other jurisdictions hold that a debtor's employee stock options awarded pre-petition constitute assets that become part of the bankruptcy estate upon filing, even if the debtor only becomes entitled to actually exercise the options post-petition. *See Allen v. Levey (In re Allen)*, 226 B.R. 857 (Bankr.N.D.Ill. 1998); *In re Lawton*, 261 B.R. 774 (Bankr. M.D.Fla.2001); and *In re Dibiase*, 270 B.R. 673 (Bankr.W.D.Tex.2001). There are no contrary cases.

Based on the foregoing, the four Agreements created by the Company and received by the Debtor pre-petition granting Options to purchase Ten Thousand shares of the common stock of the Company, be-

---

1. $14.060 per share acquisition price X 400 shares = $5,624.00; $21.437 per share sales price X 400 shares = $8,574.80; $8,574.80–$5,624.00 = $2,950.80.

2. $7.625 per share acquisition price X 200 shares = $1,525.00; $21.437 per share sales price X 200 shares = $4,287.40; $4,287.40–$1,525.00 = $2,762.40.

3. $2,950.80 + $2,762.40 = $5,713.20.

came property of the bankruptcy estate as a matter of law. The Debtors claim that, as of the filing date, he valued the Options to purchase Two Thousand Six Hundred (2600) shares that accrued but remained unexercised at zero, as a basis for his contention that the Options were not property of the bankruptcy estate is unpersuasive. Likewise, the Debtor's claim that, as of the filing date, he had not worked long enough to earn the right to exercise the Option to purchase an additional Two Thousand (2000) shares, as a basis for his contention that the Options were not property of the estate, is also unpersuasive. The fact that some of the Options had not accrued and were not exercisable as of the petition date, but whose exercise was contingent on the Debtor's continued post-petition employment, is of no consequence to the issue of ownership of the Options on the petition date.

■ The right to use Options owned (i.e. to exercise them and purchase stock) is distinct from ownership of the Options themselves (i.e. the contractual right(s) to purchase stock in the future). The Options were the property that became estate property on the petition date, not the stock that could later be purchased using the option. The right to purchase itself is a species of intangible personal property. *In re Dibiase,* 270 B.R. 673, 678 (Bankr. W.D.Tex.2001) citing 11 U.S.C. § 101(16),(49)(2000)(stock options are a right to purchase); and *In re Tobiason,* 185 B.R. 59,63 (Bankr.D.Neb.1995)(concluding that a stock option was property of the estate). As noted by the *Dibiase* Court, "options, by their nature, are exercisable in the future, and so typically contain a date before and a date after which the option cannot be exercised. These exercise limits do not make the option any more or less a real interest in property as

of the date of the grant..." *Dibiase,* 270 B.R. at 678.

■ In the case at bar, the Debtor owned contractual rights to purchase stock in the future on the petition date which were subject to certain limitations of use and to the possibility of defeasance by later events. In other words, while the grant of Options (contractual rights) by the Company was immediate, their usage was subject to a condition subsequent, that being future employment. Nonetheless, it is well settled that postponed enjoyment does not disqualify an interest as property. *In re Allen,* 226 B.R. 857, 863 citing *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)(commenting that "the term 'property' has been construed most generously as an interest that is not outside its reach because it is novel or contingent or because enjoyment must be postponed."). Therefore, whether the estate would be able to exercise the Options in the future pursuant to the terms of the Agreements involving the Debtor's post-petition employment is irrelevant to the issue of ownership of the Options. The Debtor's contract rights under the Agreements, whether accrued or contingent, became property of the estate under 11 U.S.C. § 541(a)(1) on the petition date.

■ Although the accrued and contingent contractual rights to purchase stock in this case were and are property of the estate, the Debtor points out that the right to exercise Options to purchase Two Thousand (2000) of the shares accrued post-petition. As such, the Debtor claims the estate should not be entitled to the Options that became exercisable post-petition and/or to the proceeds resulting from the sale of shares obtained through the exercise of Options that accrued post-petition, based on the theory that the rights accrued as a result of his continued employment. This contention is also unper-

suasive on the issue of ownership of the Options on the petition date for the reasons cited *supra.* Any relevance the Debtor's post-petition employment may have had on any issue involving the disputed Options in this case involves the value of the Options on the petition date.

■ With respect to the Options to purchase Two Thousand Six Hundred (2600) shares of stock which accrued and became exercisable pre-petition, those Options in their entirety belong to the estate. It is irrelevant to the issues of ownership that the Options were exercised and shares of stock purchased and sold post-petition. The fact that the Options accrued and became exercisable pre-petition and were not claimed exempt is sufficient to establish that, as of the petition date, the Options became property of the estate. Accordingly, the entire value of the proceeds of the Two Thousand Six Hundred (2600) shares sold post-petition by the Debtor is property of the estate.

■ With respect to the remaining Options to purchase Two Thousand (2000) shares of stock which accrued and became exercisable post-petition, this Court adopts the reasoning of the *Dibiase* Court and finds that the Options in their entirety belong to the estate. The Options were not after acquired property of the Debtor. As discussed *supra*, the Options to purchase stock were property rights granted by the employer pre-petition. As such, they became property of the estate at the commencement of this case. Accordingly, the estate is entitled to turnover of its property as well as the value of proceeds realized from the unauthorized post-petition sale by the Debtor.

## Allocation of Stock Options

The case law is split on the issue of allocation of value of stock options accruing post-petition.

*Allen v. Levey (In re Allen)* and *In re Lawton,* stand for the proposition that stock options are to be allocated between the estate and the debtor based on a formula that calculates what percentage of the option is attributable to the debtor's pre-petition work. Conversely, *In re Dibiase,* 270 B.R. 673 (Bankr.W.D.Tex.2001), rejects the allocation computation in *Allen* and *Lawton.* Instead, *Dibiase* focuses on the extent of the debtor's interest in the option(s) as of the petition date.

This Court declines to follow the reasoning of the *Allen* allocation formula which splits the value of options that accrue and become exercisable post petition between the estate and the debtor. While the *Allen* court found that the option in that case was estate property regardless of its exercise schedule, the court expressed concern that the trustee would have the benefit of an option whose future exercise depended on the debtor's continued post petition employment. *In re Allen,* 226 B.R. at 867.

■ As noted by the court in *Dibiase,* future events can have an impact on the future value of a stock option. Nonetheless, the mere fact that some of the asset's eventual value might be affected by post-petition events, should not of necessity affect the independent determination whether the estate owns all or only a portion of an asset.

*Allen* relies on *quantum meruit* principles based on the belief that the debtor's post-petition employment adds or creates value to the option as well as a portion of the interest in the option which it identifies as "realizable value." *Allen,* 226 B.R. at 866. The court theorizes that the debtor earns the right to exercise the option through continued employment, such that the right to exercise is property separate from the right to purchase pursuant to the grant of the option. Under this analysis

the right to exercise is identified by the court as "proceeds of property" attributable to the debtor's post-petition services/employment and therefore subject to the earnings exception in 11 U.S.C. § 541(a)(6). *Id.*

Section 541(a)(6) includes as property of the estate proceeds, product, offspring, rents, and or profits from property of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case. *Id.* The category created by subsection (6) is property generated post-petition by pre-petition property that has come into the estate. The exclusionary language applies to such property that is characterized as earnings from services performed by the debtor. As noted by the court in *Dibiase*, relying on 11 U.S.C. § 541(a)(6), the section 541(a)(6) exclusion is not the device that shelters an ordinary individual debtor's post-petition salary as those funds are already sheltered because they are generated post-petition and do not arise out of pre-petition property that may have come into the estate. *Dibiase*, 270 B.R. at 684. *Dibiase* explains that section 541(a)(6) is actually a much narrower exclusion designed to shelter proceeds of a closely held business, such as a medical practice. *Id.*

Relying on the earnings exception of section 541(a)(6) and characterizing the right to exercise an option as property created or earned by the debtor's post-petition employment, confuses the difference between conditions precedent and conditions subsequent. The *Allen* court treated the exercise of the options as a vesting mechanism, such that the debtor essentially earned the options through continued employment. In this manner, the court was treating continued employment as a condition precedent to earning the options. However, the Agreements in this case provided that the Options may be forfeited if the employee ceases to be employed which is a condition subsequent.

■ The *Dibiase* court, quoting *Corbin*, reiterates the distinction between conditions precedent and conditions subsequent and states:

> Conditions precedent…are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the judicial remedies are available.
>
> Conditions subsequent… are those facts and events that occur after breach of contract duty and that terminate the right to immediate performance and also the right to judicial remedy. The term could be used to denote those facts and events that occur after a contract has been made and operate as its discharge and termination, without regard to whether there has been a breach or not. By this usage, the facts and events would be related to the primary contractual rights and duties, rather than to the right and duty of immediate performance and breach thereof.
>
> …conditions will either be precedent to the duty of immediate performance (and its breach) or subsequent to that duty (and its breach).

*Id.* at 685 quoting ARTHUR L. CORBIN, CORBIN ON CONTRACTS (ONE VOL. ED.), §§ 627–28, at pp. 583–84, 585, 586, 587–88 (west 1952). The condition precedent that the *Allen* court presumed was the debtor's continued employment. *Id.* at 686. As noted by *Dibiase* however, " 'continued employment' is not a new fact or event that creates the right to exercise the option. It is the *status quo ante*. The 'new fact or event' that the option agreement contemplates is termination of employment, in which case the existing rights under the option are *forfeited*." *Id.* This

Court concurs with *Dibiase* that, termination of employment represents the operation of a condition subsequent rather than of a condition precedent. The distinction between continued employment and termination of employment are significant as applied to the facts.

Just as in *Dibiase*, the relevant event under the Agreements in this case is termination of employment which, if it occurs, relieves the employer from performance. That is the essence of a condition subsequent. As in *Dibiase*, the Debtor here does not earn the right to use the Options at all in this case. The rights were granted by the Options at the outset. The Debtor can forfeit some or all of the benefit of the Options by voluntarily terminating employment, or by being fired, but absent the occurrence of these events, the Options had their full value on the day they were granted. On the petition date, the debtor was employed and thus owned the Options. There were no conditions precedent to their ownership, though there were qualifications on how and when the Option could be used in the future.

 The Debtor claims that he should not be compelled to turn over the proceeds of the post-petition sales of stock or the accrued unexercised Options that remain in his possession, even if the Options were property of the estate. The Debtors contends that he received no assistance from his first attorney; his first attorney, Jeffrey Lathe, was disbarred after the commencement of his case; he was unaware of the disbarment of his attorney; and the Debtors claim that the Trustee had a duty to either inform the Debtor that his attorney was disbarred or inform the disbarred attorney that he should contact the Debtor. Finally, the Debtor asserts he should not have to turn over the proceeds of the sales or remaining unexercised Options because the Trustee took too long to administer the asset. Moreover, the Debtor

asserts that having to pay the proceeds derived from the sales to the Trustee would deprive him of the protection under the Bankruptcy Code. It was not the Trustee's duty in this case to inform the Debtors that their attorney had been disbarred as suggested. Conversely, it was the Debtor's duty to stay reasonably informed as to the status of his case and it was for his attorney to refrain from taking unauthorized action involving estate property. There is no evidence suggesting the Trustee was dilatory in pursuing this action to administer these assets.

For all of the foregoing reasons, the Debtor's claims that the Options are not property of the bankruptcy estate as of the petition date will not stand. The exclusion argument will not stand either, as all of the Options became property of the estate on the petition date, and were not claimed as exempt. None of the Options are attributable to the post-petition efforts of the Debtor. Accordingly, based on the foregoing, the Court finds as follows:

1. The Trustee's Motion to Compel Turnover of Estate Property is **granted**.

2. The Debtors, Ronald William Carlton and Linda Jean Carlton, are directed to immediately turn over to the Trustee the total amount of Twenty Six Thousand Three Hundred Forty Three and 20/100 ($26,343.20) Dollars representing the post-petition exercise of the 1997, 1998, and 1999 Options to purchase Three Thousand Six Hundred (3600) shares of Ameripath stock and subsequent sale of shares purchased.

3. The Debtors shall also turnover to the Trustee the remaining unexercised Options.